Barbara SMITH, et al., Plaintiffs,

v.

BROWN & WILLIAMSON TOBACCO CORPORATION, et al., Defendants.

No. 96–0459–CV–W–3.

United States District Court, W.D. Missouri, Western Division.

May 22, 1997.

---

Gregory Leyh, Kenneth B. McClain, II, Humphery, Farrington & McClain, Independence, MO, John M. Klamann, Overland Park, KS, for Barbara Smith.

Gary R. Long, William S. Ohlemeyer, Shook, Hardy & Bacon, Kansas City, MO, for Brown & Williamson Tobbaco Corporation.

Gary R. Long, William S. Ohlemeyer, Shook, Hardy & Bacon, Kansas City, MO, Jerome D. Riffel, William C. Odle, Lathrop & Gage L.C., Kansas City, MO, Jennifer S. Dominitz, Mary Elizabeth McGarry, Joseph M. McLaughlin, Simpson, Thacher & Bartlett, New York City, for B.A.T. Industries p.l.c.

### ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

SMITH, District Judge.

Pending is Plaintiffs' Motion for Class Certification. For the reasons set forth below, the motion is denied.

### I. BACKGROUND

Plaintiff Barbara Smith ("Smith") was born in 1927; she smoked her first cigarette in 1942 when she lived in Nashville, Tennessee. Plaintiff's Depo. at 9, 90. From 1949 to 1990, her cigarette of choice was Kools, which are manufactured by Defendant; prior to that time she smoked cigarettes manufactured by a different company, and the record does not reflect her brand–preference after 1990. Plaintiff's Depo. at 92–96; Tr. at 4. She stopped smoking in 1992 after being diagnosed as suffering from lung cancer. Tr. at 4. She is currently a resident of Missouri, but the record does not establish when

1. Defendant B.A.T. Industries, p.l.c. was dismissed by Order dated December 19, 1996.

2. The Court agrees that there are certain flaws in this class definition. Most notable is the difficulty in determining who would be bound by a judgment should Defendant prevail (or, conversely, who would be entitled to share in the judgment should the class prevail). This problem arises because the class defines members as those harmed by Defendant's cigarettes; if someone files a suit after this one concludes, a mini–lawsuit would be required to determine whether that person was bound by the judgment in this case.

she moved to this state. Plaintiff's First Amended Complaint sets forth thirteen counts, asserting various theories of recovery for injuries allegedly incurred from smoking cigarettes manufactured by Defendant Brown & Williamson Tobacco Corporation ("Defendant").[1] Plaintiff has also requested certification of a plaintiff class, and a hearing was held on March 6, 1997 to permit the parties to present evidence and arguments relating to this request.

■ In response to cases decided after her complaint was filed, Plaintiff has (understandably) changed the definition of the proposed class. At present, Plaintiff proposes certification of the following class:[2]

> All persons in the State of Missouri who have suffered personal injury as a result of smoking cigarettes designed, manufactured or sold by Brown & Williamson Tobacco Company, including the estates, representatives, administrators, heirs and survivors of these injured persons.

If this class is certified, Plaintiff would assert the following claims against Defendant: (1) strict liability for sale of unreasonably dangerous product, (2) failure to warn (prior to 1970), (3) strict liability based on design defect, (4) negligent testing and research, (5) breach of express warranty of safety, and (6) breach of implied warranty of merchantability and safety. In addition, Plaintiff has requested punitive damages and an order requiring medical monitoring of the class members; these requests are set forth in separate counts. Plaintiff has declared that she would dismiss the remaining five counts if the class is certified.[3]

However, "[a] court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly." *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993). The problems with Plaintiff's proposed definition could be remedied by, for instance, defining members as those who have smoked or currently smoke Defendant's cigarettes. In any event, because the flaws can be easily remedied, the Court will neither dwell nor rely upon them.

3. If a class is certified, Plaintiff intends to dismiss Counts 5, 6, 9, 10 and 11. The Court construes the Plaintiff's intentions as conditional;

In response to the Court's request, Plaintiff filed a proposed trial plan. In Phase One, Plaintiff proposes trying all common issues, which she identifies as consisting of the following:

(1) whether Defendant's cigarettes are addictive or cause disease;

(2) whether safer and/or non–addictive designs were available;

(3) whether Defendant was negligent;

(4) whether Defendant failed to warn of health dangers;

(5) whether Defendant knew that its cigarettes are addictive or hazardous;

(6) whether Defendant breached express or implied warranties;

(7) whether Defendant's conduct justifies an award of punitive damages; and

(8) whether Defendant should provide a fund to pay for medical monitoring.

Plaintiff proposes submitting interrogatories to the jury in order to permit specific findings with respect to each brand of cigarette (along with each change made to each brand) and each advertising campaign used for each brand. Plaintiff also suggests that Phase One is appropriate for resolution of some of Defendant's defenses. If the jury determines in Phase One that punitive damages are appropriate, Phase Two will be used to let the jury determine the amount of punitive damages to be awarded. Finally, Plaintiff proposes that Phase Three be used to litigate "individual" matters, including causation, reliance, damages to be awarded to each class member and (presumably) comparative fault.[4]

## II. DISCUSSION

In order to maintain a class action, Plaintiff must satisfy four prerequisites, all of which are set forth in Rule 23(a):

(1) the class is so numerous that joinder of all members is impracticable,

(2) there are questions of law or fact common to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) the representative parties will fairly and adequately protect the interests of the class.

Upon satisfying these four prerequisites, Plaintiff must demonstrate that her claims qualify under one of the three subparts of Rule 23(b). Plaintiff contends that her medical monitoring claim can satisfy Rule 23(b)(1)(A) or Rule 23(b)(2) and that the remainder of her claims satisfy Rule 23(b)(3). Rule 23(b)(1)(A) permits certification of a class if there is a risk that separate adjudications will result in "inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class," and Rule 23(b)(2) applies if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Rule 23(b)(3) permits creation of an "opt–out" class if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

At the outset, the Court notes that the parties have occasionally supported their positions by trying to prove whether class actions are generally appropriate in mass tort actions.[5] This inquiry is a red herring. The

accordingly, because her motion to certify is denied, these counts will not be dismissed at this time.

**4.** Comparative fault will certainly apply to the negligence claim. In addition, comparative fault may (or may not) apply to claims of strict liability, depending upon when the particular class member's claim arose. *See Burgess v. Suzuki Motor Co.*, 71 F.3d 304, 307 (8th Cir.1995) (con-

struing Mo.Rev.Stat. § 537.765.1 and holding that comparative fault applies to strict liability claims arising after July 1, 1987).

**5.** For what it's worth, the Ninth Circuit recently observed that "[t]he history of class action certifications and products liability cases in this circuit and elsewhere has not been luminous." *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1230 (9th Cir.1996).

term "mass tort" describes a wide variety of cases; a products liability claim could be a mass tort, but so would be the claims asserted by a class composed of occupants of a building that collapses—yet the inquiry would be dramatically different in both cases. *Cf. Castano v. American Tobacco Co.*, 84 F.3d 734, 746 n. 23 (5th Cir.1996); *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1196–97 (6th Cir.1988). It is inappropriate to grant or deny class certification in *this* case based simply on the truth or falsity of whether mass tort cases are amenable to certification. The only way to decide the issue in the context of this case is to examine the claims Plaintiff wishes' to assert and determine whether they can be presented in a manner that complies with Rule 23's requirements.

### A. Rule 23(a)

As set forth more fully below, the Court concludes that Plaintiff has not satisfied the general requirements set forth in Rule 23(a).

#### 1. Numerosity

■ In order to gather information on this element, Plaintiff placed an advertisement in approximately eight newspapers throughout the state, including newspapers in Kansas City, St. Louis, Springfield, Joplin, St. Joseph and Hannibal. In response to these advertisements, over 988 people have contacted Plaintiff's attorney and have indicated that they have smoked Defendant's cigarettes and they suffer from smoking–related illnesses. Plaintiff's conservative estimates suggest that there may be in excess of 2000 members of the proposed class.

Defendant has conceded that the numerosity requirement has been satisfied and, based on the information described above, the Court agrees.

#### 2. Commonality & Predominance

The clear language of Rule 23(b)(3) demonstrates that the issue of commonality—found in the mandatory requirements of Rule 23(a)(1)—and the issue of predominance—found in Rule 23(b)(3)—are obviously intertwined. *Cf. Harding v. Tambrands. Inc.*, 165 F.R.D. 623, 627 (D.Kan.1996); *Ryan v. Eli Lilly & Co.*, 84 F.R.D. 230, 233 (D.S.C.

1979). Accordingly, these two elements will be discussed together.

■ Plaintiff has isolated issues that all class members will need to prove. If each class member proceeds with his or her individual trial, all such trials will require the fact finder to determine whether the cigarettes smoked are hazardous, whether Defendant's advertising was misleading, whether warranties were breached, and so forth. These issues are "substantially related to the resolution of litigation," so the commonality requirement appears to have been satisfied. *See DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1174 (8th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1544, 134 L.Ed.2d 648 (1996); *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561 (8th Cir.1982). As discussed below, however, these issues are only common in a general sense: resolution of these issues will have little to no legal or practical significance for this case. Consequently, though these issues appear common, they do not really satisfy the commonality requirement.

Moreover, commonality alone is · insufficient to satisfy the predominance requirement. "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir.1996). "In order to 'predominate,' common issues must constitute a significant part of the individual cases." *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir.1986). Resolution of the common issues in this case will not promote judicial economy; in fact, in light of the individual issues a class action in this case will create judicial *dis*economy.

#### a. Variances in Substantive Law

One of the largest barriers to commonality and predominance is the variance in applicable state laws. The Fifth Circuit recently observed that "[i]n a multi-state class action, variations in state law may swamp any common issues and defeat predominance." *Castano*, 84 F.3d at 741; *see also In re American Med. Sys.*, 75 F.3d 1069, 1085 (6th Cir. 1996). Plaintiff has attempted to avoid this

problem by defining the class to include only Missouri citizens, which Plaintiff believes will result in the need to apply only Missouri's substantive law. *See* Plaintiff's Reply to Defendant's Opposition to Class Certification at 10. Upon further inquiry, Plaintiff revealed that this conclusion was based on the premise that if smoking–related injuries were discovered in Missouri, Missouri substantive law would apply. Tr. at 90–91. The Court does not agree with this analysis. *See Thorn v. International Business Mach., Inc.,* 101 F.3d 70, 73 (8th Cir.1996) (pointing out that choice of substantive law and choice of procedural law are governed by different considerations).

■■■ In a diversity case, a federal court applies both the choice of law rules and statutes of limitation (including borrowing statutes) of the state in which it sits. *Horn v. B.A.S.S.,* 92 F.3d 609, 611 (8th Cir.1996); *Nettles v. American Tel. & Tel. Co.,* 55 F.3d 1358, 1362 (8th Cir.1995). Under Missouri law, discovery of the injury is relevant in determining when a cause of action accrues and, consequently, which state's statute of limitations should apply; however, it is not dispositive in determining which state's substantive law will govern. This distinction was set forth in *Elmore v. Owens–Illinois Inc.,* 673 S.W.2d 434 (Mo. banc 1984). There, the Missouri Supreme Court was confronted with a Kansas plaintiff who was exposed to asbestos at his workplace in Missouri. The first issue before the court was whether Kansas's statute of limitations applied; if so, plaintiff's claims were time–barred. The court held that the Kansas limitation period applied only if plaintiff's claims accrued in Kansas, and "a cause of action accrues when and originates where damages are sustained and are capable of ascertainment." 673 S.W.2d at 436. The

Court went on to hold that the cause of action accrued when the plaintiff's doctor first diagnosed plaintiff as suffering from asbestosis and not when the plaintiff first experienced shortness of breath. *Id.* Plaintiff learned of his asbestosis at his doctor's office in Missouri, so Missouri's statute of limitations governed his claims.

After concluding that the suit was not barred by the statute of limitations, the court proceeded to determine whether Missouri or Kansas substantive law governed the plaintiff's claims. Although the court concluded that Missouri law governed, it is significant that the court did not reach this conclusion simply because Missouri's statute of limitations applied. Instead, the court applied the factors found in § 145 of the Restatement (Second) of Conflicts as required by *Kennedy v. Dixon,* 439 S.W.2d 173 (Mo. banc 1969)— commonly known as the significant contacts test. *Id.* at 436–37.[6]

*Elmore* demonstrates two important concepts with respect to class members who have not always lived in Missouri. First, each individual's circumstances will have to be scrutinized to determine when and where they first discovered they suffered from smoking–related illnesses so that the appropriate limitation period can be applied. For those whose claims are not time–barred, a separate inquiry will be required to determine which state's substantive laws will govern. In the case of a life–long Missouri resident, it seems clear that Missouri law would apply. In the case of a resident of another state who stopped smoking before moving to Missouri, it seems clear that Missouri law would not apply. In the case of a person (like Plaintiff) who began smoking in another state and then moved to Missouri, the choice of law inquiry will vary with the circumstances. It is inconceivable that Mis-

6. "With respect to the substantive law of torts, Missouri has adopted § 145 of the Restatement (Second) of Conflict of Law, which provides that the rights and liabilities of the parties are governed by the substantive law of the state with the most significant relationship to the occurrence and the parties.

Pursuant to § 145(2) of the Restatement, the most significant relationship is determined by considering the following factors, according to their relative importance:

(a) the place where the injury occurred;
(b) the place where the conduct causing the injury occurred;
(c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and
(d) the place where the relationship, if any, between the parties is centered."
*Harter v. Ozark–Kenworth, Inc.,* 904 S.W.2d 317, 320 (Mo.Ct.App.1995) (citation omitted).

souri' law will apply to all members of the class; in fact, it is possible that different state's laws will apply to the different claims asserted by a single claimant: for instance, it may be that one state's laws will apply to a person's breach of warranty claims while another state's laws apply to that individual's strict liability claims.

Ultimately, it is clear that Missouri law will not apply to all of the class members' claims. Thus, although Plaintiff does not seek certification of a nationwide class, the claims presented by the proposed class will still be governed by a myriad of state's laws. The wide variety of state laws that must be applied diminishes the common issues and prevents them from predominating.

### b. Practical Role of the Common Issues

As stated above, the common issues identified by Plaintiff are common because they are, generally speaking, matters that will be at issue in all lawsuits asserted by the class members. However, certifying a class in order to obtain a global resolution of these issues will not advance the resolution of this case.

First, some of the common issues are common in general sense, but are not appropriate issues for certification. For instance, whether cigarettes cause disease or are addicting is only part of other, larger issues to be decided in the case. These are important matters, and certainly will be addressed by the parties at trial; however, "[a] finding of 'general causation' would do little to advance this litigation." *Harding*, 165 F.R.D. at 630; *see also In re Tetracycline Cases*, 107 F.R.D. 719, 733 (W.D.Mo.1985); *Mertens v. Abbott Lab.*, 99 F.R.D. 38, 41 (D.N.H.1983). Liability will not turn on whether cigarettes are generally capable of causing disease: liability will depend upon whether cigarettes caused a particular plaintiff's disease. The latter inquiry will turn in numerous individu-

al factors, rendering the causation factor inappropriate for common disposition. *See id.* Under Plaintiff's proposal, the jury would not decide whether a particular class member's disease was caused by smoking until Phase Three, but it is neither reasonable nor feasible to ask a jury to hear the individualized claims of all 2000+ class members. Even if this could be done, it is not possible for a jury to give the same consideration to the "general causation" evidence when hearing evidence about the first class member as when hearing evidence about the last class member. This problem cannot be solved by having different juries decide the individual issues because subsequent juries would not be aided with the general statement that "smoking can cause cancer;" a subsequent jury would need to rehear evidence about the link between smoking and cancer in order to decide the etiology of a given plaintiff's disease. This will result in both diminishment of any time saved by the class action and a genuine risk that the general issue would be "redecided" by the subsequent jury.[7]

The second bar to a finding of commonality and predominance is that some common issues cannot be decided without consideration of individual issues. For instance, the issue of Defendant's negligence cannot be decided without reference to the class members' comparative fault. Under Missouri's[8] system of comparative fault, "[t]he key ... is that a jury decides the issues of relative fault and assesses appropriate percentages [and] since the apportionment of fault and damages is factual by nature, a jury should be as fully informed as possible in order to determine the relative fault of the parties." *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 107 (Mo. banc 1996) (citation omitted). Because a finding of negligence cannot be made without consideration of the plaintiff's compara-

---

7. Utilizing a separate jury may also violate the Seventh Amendment because the issues of the parties' relative "faults" are too intertwined to permit separation. *Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931); *Ryko Mfg. Co. v. Eden Services*, 823 F.2d 1215, 1239 (8th Cir.1987), *cert. denied*, 484 U.S. 1026, 108 S.Ct. 751, 98 L.Ed.2d 763 (1988); *Richardson v. Com-*

*munications Workers of America*, 530 F.2d 126, 130 (8th Cir.), *cert. denied*, 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976).

8. Although Missouri law will not govern all class members' claims, for ease of discussion it will be used for all illustrative purposes.

tive fault, the apparent general issue of negligence is overwhelmed by individual issues.

This same fault lies with other common issues. Consider the common issue regarding whether Defendant failed to warn: although it is presumed that a warning would have altered the behavior of individuals, "a preliminary inquiry before applying the presumption is whether adequate information is available *absent* a warning.... As causation is a required element of the plaintiffs' case, the burden is on plaintiffs to show that lack of knowledge." *Arnold v. Ingersoll–Rand Co.,* 834 S.W.2d 192, 194 (Mo. banc 1992) (emphasis in original). Similarly, claims that Defendant breached expressed warranties are permeated with individual issues because these claims require proof that purchasers were induced to make purchases based on affirmative representations. *E.g., Stefl v. Medtronic, Inc.,* 916 S.W.2d 879, 882–83 (Mo.Ct.App.1996); *Carpenter v. Chrysler Corp.,* 853 S.W.2d 346, 357 (Mo.Ct.App.1993). Both the content of representations made and the role those representations played in individual purchasing decisions are issues that will vary from person to person.

■ Finally, Plaintiff proposes litigating matters relating to damages before liability is established. Punitive damages, for instances, can be awarded only if actual damages are proven. *E.g., Haas v. Town and Country Mortg. Co.,* 886 S.W.2d 225, 229 (Mo.Ct.App.1994); *Thornbrugh v. Poulin,* 679 S.W.2d 416, 419 (Mo.Ct.App.1984) (citing *Compton v. Williams Bros. Pipeline Co.,* 499 S.W.2d 795, 797 (Mo.1973)). Plaintiff's proposal to have liability for punitives established in Phase I, then wait until Phase III to see if class members have suffered damages so they can "keep" the award, not only means the Court, parties and jury will be forced to address issues that may become moot but also radically alters appropriate consideration of the issue and may actually violate Missouri law. *See In re Tetracycline Cases,* 107 F.R.D. at 734. Furthermore, the amount of punitives must bear a relationship

to the actual damages suffered, *Jacobs Mfg. Co. v. Sam Brown Co.,* 19 F.3d 1259, 1265 (8th Cir.), *cert. denied,* 513 U.S. 989, 115 S.Ct. 487, 130 L.Ed.2d 399 (1994), and the jury that decides liability must also decide whether punitive damages are warranted, *Panjwani v. Star Service & Petroleum Co.,* 395 S.W.2d 129, 133 (Mo.1965); *Owens v. Automobile Recovery Bureau, Inc.,* 544 S.W.2d 26, 35 (Mo.Ct.App.1976), so the same jury must sit from the beginning of trial to the end for all 2000 + class members—an extremely burdensome endeavor to ask of any jury and, probably, an unmanageable task for the court.[9] Similarly, medical monitoring damages are available only after there has been a showing of increased risk of health problems (e.g., cancer). *Elam v. Alcolac. Inc.,* 765 S.W.2d 42, 208–09 (Mo.Ct.App.1988). Entitlement to such damages, then, depends upon an individualized showing of future risk, making resolution of this issue inappropriate for class-wide resolution. *Thomas v. FAG Bearings Corp. Inc.,* 846 F.Supp. 1400, 1410 (W.D.Mo.1994).

### 3. Typicality and Adequacy of Representation

■ "The Rule 23(a)(3) requirement of typicality and the Rule 23(a)(4) requirement that the named representative adequately represent the entire class overlap. If the class representative's claims are not typical of the class, the representative cannot adequately protect the interests of the absent class members." *Harding,* 165 F.R.D. at 628 (citation omitted). "Typicality ... 'requires a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff.'" *Tate v. Weyerhaeuser Co.,* 723 F.2d 598, 608 (8th Cir.1983), *cert. denied,* 469 U.S. 847, 105 S.Ct. 160, 83 L.Ed.2d 97 (1984) (quoting *Donaldson v. Pillsbury Co.,* 554 F.2d 825, 830 (8th Cir.), *cert. denied,* 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977)). Plaintiff concedes the need to identify more representatives in order to provide adequate representation for diseases and other harms that

---

**9.** Plaintiff correctly contends that the separation of punitive damages from actual damages was approved by the Fifth Circuit in *Jenkins,* 782 F.2d at 474. However, the Fifth Circuit expressly held that the procedure was permitted by Texas law; here, Missouri law governs, and the practice does not appear permissible under Missouri law.

Plaintiff does not suffer. Tr. at 23. The Court believes that Plaintiff has understated the need for additional subclasses and corresponding representatives. "A fundamental requirement of representatives in a class action is that they must be members of the subclasses they represent. The representatives must possess the same interest and suffer the same injury as their fellow class members." *Roby v. St. Louis Southwestern Ry. Co.*, 775 F.2d 959, 961 (8th Cir.1985) (quotation and citations omitted). In this case, Plaintiff's claim that the brand she smoked (Kool) caused cancer is not typical of another class member's claim that another brand (Viceroy) caused cancer. Those that smoked Kools exclusively cannot adequately represent the interests of those that smoked Kools and another brand—particularly when the "other brand" was not manufactured by the Defendant. Moreover, design changes in defendant's products add further lines of distinction—a person who smoked Raleigh's in 1945 did not smoke the same cigarette as a Raleigh smoker in 1985. Finally, the vagaries of various states' laws may add an additional layer of differentiation.[10] *Cf. Castano*, 84 F.3d at 743.

At first glance, it would seem that these problems can be solved by adopting a multitude of subclasses. Given the number of permutations involved, this task appears virtually impossible; at best, it greatly diminishes any advantage certification offers over individual trials. Furthermore, the need for numerous subclasses to promote typicality demonstrates the initial lack of common issues, so predominance is diminished as more subclasses are added. *E.g., Harding* 165 F.R.D. at 630.

### B. Rule 23(b)(3) "Opt Out" Class

■ Much of the above discussion dovetails into the analysis required by Rule 23(b)(3). The generally common issues are, in many instances, not truly common in light of the need to consider individual matters. Furthermore, the "common" issues do not predominate over the individual issues. In light of the legal flaws identified above,

Plaintiff's proposed trial plan is not workable or feasible, will not provide efficiencies that justify certification, will not allow for the proper consideration of certain issues as required by Missouri law, and may actually violate Defendant's Seventh Amendment rights. Finally, the need to implement multiple subclasses to preserve typicality undercuts both the superiority and predominance required by Rule 23(b)(3).

Assuming certification were manageable and in some degree superior, Plaintiff's doomsday prediction of a storm of cases being filed does not justify certification. Circumstances that might lead to such a "judicial crisis" have existed for some time, but the flood of suits has not arrived. When it does, less drastic alternatives (such as consolidation for discovery purposes) are available to aid the judiciary's efforts to deal with the situation. In this regard the Court notes the presence of a warehouse of information established pursuant to a court order in Minnesota, which provides plaintiffs the opportunity to obtain discovery information—much like the Plaintiff has in this case.

The Court is also concerned that forcing the plethora of individual issues into a class action constitutes a disservice to both potential class members and the Defendant. Given the number, magnitude and importance of the individual issues, certain class members' voices may be lost amidst the sheer number of fellow plaintiffs—each with different stories to tell. Conversely, the Defendant will be in a position where it has to prepare for nearly 2000 different trials simultaneously. Finally, neither party can seriously expect a jury's full attention and consideration for the length of such proceedings, nor can they expect evenhanded, consistent treatment from beginning to end This is not an indictment of the class action procedure, but an acknowledgment of human nature that will surely be present among the jurors. The Court understands this is a risk in all class actions; however, the risk is heightened here because of the number and nature of the individual issues.

---

**10.** These factors are also proper considerations when ascertaining the commonality and predo-minance of the class's claims. *E.g., In re Medical Sys., Inc.*, 75 F.3d at 1085.

The Court concludes that even if Rule 23(a)'s general requirements have been satisfied, the particularized requirements of Rule 23(b)(3) have not.[11]

### C. Rule 23(b)(1)(A)

"Rule 23(b)(1)(A) directs the court to consider whether individual actions would have an adverse effect on the party opposing the class." 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 1773 at 427 (1986). Specifically, "Rule 23(b)(1)(A) is designed to protect against the nonclass party's being placed in a stalemated or conflicted position and is applicable only to actions in which there is not only a risk of inconsistent adjudications but also where the nonclass party could be sued for *different* and *incompatible* affirmative relief." *Employers Ins. of Wausau v. Federal Deposit Ins. Corp.*, 112 F.R.D. 52, 54–55 (E.D.Tenn.1986) (emphasis added); *see also* Wright, Miller & Kane, § 1773 at 429–31. In invoking Rule 23(b)(1)(A), Plaintiff has specifically pointed to her request that Defendant establish a fund to enable monitoring for and treatment of future medical needs. Plaintiff contends that forcing the class members to institute individual lawsuits creates a risk of inconsistent adjudications.

■ Although individual lawsuits might end with different results, this does not justify certification of the class. As stated above, see page 97, *supra*, medical monitoring constitutes an element of damages, and the fact that some successful plaintiffs may obtain this element of damages while others do not does not justify invocation of Rule 23(b)(1)(A). *E.g., Vaughter v. Eastern Air Lines*, 817 F.2d 685, 690 (11th Cir.1987); *In re Bendectin Products Liability Litig.*, 749 F.2d 300, 305 (6th Cir.1984); Wright, Miller & Kane, § 1773 at 429–30. Moreover, varying results may occur because of various individual issues that will dictate a particular class members' entitlement to, and the nature of, medical monitoring. When the relief in question is fraught with individualized issues, resort to Rule 23(b)(1) is inappropriate. *See In re Catawba Indian Tribe of South Carolina*, 973 F.2d 1133, 1137 (4th Cir.1992) (discussing Rule 23(b)(1)(B)).

A review of the Committee Notes to Rule 23 confirms the above analysis. The Committee observed that Rule 23(b)(1)(A) is designed to cover those situations in which a party may be ordered to act in inconsistent ways if individual suits were permitted to proceed. As examples, the Committee cites "[s]eparate actions by individuals against a municipality to declare a bond issue invalid or condition or limit it, to prevent or limit the making of a particular appropriation, or to compel or invalidate an assessment .... [or] individual litigations of the rights and duties of riparian owners, or of landowners' rights and duties respecting a claimed nuisance, could create a possibility of incompatible adjudications." A judgment in one case that, for instance, invalidates a bond issue is necessarily inconsistent with a judgment in another case that validates it. Generally speaking, there is nothing inconsistent in saying one smoker is entitled to damages for medical monitoring while another is not—and this general statement is made more true when one factors in the individualized determinations involved in reaching these different results. For these reasons, Rule 23(b)(1)(A) does not permit class certification of Plaintiff's claim for medical monitoring even if Plaintiff had satisfied the general requirements contained in Rule 23(a).

### D. Rule 23(b)(2)

■ A class may be certified under Rule 23(b)(2) if final relief of an injunctive nature is appropriate. According to the Committee Notes, this "subdivision does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." *See also In re School Asbestos*

---

11. Rule 23(b)(3) sets forth a nonexhaustive list of four factors that may be considered. "In many ways the factors listed in the rule are interdependent and overlapping both among themselves and with the prerequisites to a class action pre-scribed in Rule 23(a)." 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane at § 1780, p. 562. The Court believes its discussion of Rule 23(b)(3) to be sufficient without actually reciting the four factors.

**100**

*Litigation,* 789 F.2d 996, 1008 (3d Cir.), *cert denied,* 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986) (suit to obtain "mandatory injunctive relief in the form of certain remedial action and restitution for expenditures already incurred" is designed primarily to obtain monetary relief and is therefore inappropriate under Rule 23(b)(2)); *Heartland Communications, Inc. v. Sprint Corp.,* 161 F.R.D. 111, 117 (D.Kan.1995). The Court understands that "[c]lass actions certified under Rule 23(b)(2) are not limited to actions requesting only injunctive or declaratory relief, but may include cases that also seek monetary damages," but the class members' claims for money damages must be "merely incidental" to their primary claim for injunctive relief. *Probe v. State Teachers' Retirement System,* 780 F.2d 776, 780 (9th Cir.1986), *cert. denied,* 476 U.S. 1170, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986). Here, a medical monitoring fund will be established if the jury deems it appropriate; it thus appears that Plaintiff is not really seeking injunctive relief. Moreover, the relief requested is in the form of money which, along with Plaintiff's many other claims for monetary relief, demonstrates that monetary relief is the predominate relief sought. Thus, even if Rule 23(a)'s requirements have been met, a Rule 23(b)(2) class is not appropriate.

## III. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Class Certification (Doc. # 83) is DENIED.

IT IS SO ORDERED.