STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-98-555

MICHAEL A. MILLETT, CATHY LEMAR,
RICHARD LEMAR. VICTORIA EMMONS,
AND MONIQUE LEAMON on behalf of
themselves and all others similarly situated,

Plaintiffs

v.

ATLANTIC RICHFIELD COMPANY,
ARCO CHEMICAL COMPANY, LYONDELL
CHEMICAL COMPANY, OXYGENATED
FUELS ASSOCIATION, AMERICAN
PETROLEUM INSTITUTE, NANCY J.
BALTER, Ph.D, PATRICIA AHO, and
GEORGE SMITH,

Defendants

v.

WAYNE M. CONLAN,

Third Party Defendant

DECISION AND ORDER

DONALD L. GARBRECHT
LAW LIBRARY

MAR 6 2000

This matter is before this court on plaintiffs' motion for class certification pursuant to M.R. Civ. P. 23.

I.    Facts

The federal Clean Air Act, 42 U.S.C.A. §§ 7401-7671q (1995 & Supp. 1999), establishes a system for regulating air pollution that all states must comply with. The Act requires the creation of national air quality standards for six air pollutants. 42 U.S.C.A. § 7409 (1995); 40 C.F.R. §§ 50.2(a), 50.4-50.12 (1999). Known as "criteria

pollutants," these six pollutants are: carbon monoxide, lead, ozone, sulfur dioxide, nitrogen dioxide, and particulate matter. 40 C.F.R. §§ 51.852, 50.4-50.12 (1999). Air quality control regions throughout the country are rated based on whether they meet the national air quality standards for each of these designated pollutants.[1] 42 U.S.C.A. § 7407(d) (1995). Regions which do not meet the mandated levels for any of the criteria pollutants are designated "nonattainment areas," *id.* §§ 7407(d), 7501(2), and are required to reduce emissions of that pollutant. *Id.* § 7502.

Of the six criteria pollutants identified in the Clean Air Act, ozone is the one that is most problematic in Maine. Defs' Affidavit of Sacco Ex. 23 at 2.[2] Ozone is considered a secondary pollutant because it is not emitted directly into the air, but rather it is created when

> volatile organic compounds (VOCs) react with nitrogen oxides (NOx) in the presence of sunlight. VOCs are released into the air by motor vehicles, industrial facilities, dry cleaners and commercial products such as paints, solvents and cleaners. Plants and trees are natural (biogenic) sources of VOCs. NOx are produced by the combustion of fossil fuels by motor vehicles and industry.

Sacco Ex. 23 at 2. In 1990, several major amendments were made to the Clean Air Act in an effort to improve the air quality in the United States. In regards to ozone pollution, these amendments require a 15% reduction in VOC emissions from 1990

---

[1] See 40 C.F.R. §§ 81.11-81.275 (1999) for a list of the designated air quality control regions.

[2] Hereinafter Sacco Ex. _____ at _____.

2

baseline levels.[3] 42 U.S.C.A. § 7545(k)(3)(B)(i) (1995). In order to achieve this reduction in VOCs, the Act requires the Environmental Protection Agency (EPA) to create requirements for the use of reformulated gasoline in areas of the country which do not meet the mandated levels for ozone. *Id.* § 7545(k). "Reformulated gasoline (RFG) is gasoline that has an increased 'chemical' oxygen content." Sacco Ex. 22 at 7. RFG contains 2% oxygen by weight which enables the fuel to burn cleaner, thus reducing the emission of VOCs. *Id.* In order to achieve this increased chemical oxygen content, oxygenates are added to the gasoline. Methyl-tertiary-butyl ether, more commonly known as MTBE, is the most widely used oxygenate in the country. Sacco Ex. 23 at 5. Although MTBE was first produced by defendant ARCO Chemical Company in the 1960s, it was not produced commercially until 1979 when it was first added to conventional gasoline in low concentrations of about 2-3% to replace lead as an "anti-knock agent and to boost octane."[4] To meet the requirements of the Clean Air Act amendments, the petroleum industry, working in conjunction with the EPA, developed 11% MTBE RFG.[5] Sacco Ex. 22 at 4.

While certain areas of the country with severe levels of ozone pollution are required to participate in the federal reformulated gasoline program (hereinafter

---

[3] Starting this year, the Clean Air Act Amendments require a 25% reduction in VOC emissions from the 1990 baseline levels. 42 U.S.C.A. § 7545(k)(3)(B)(i) (1995).

[4] Defs' Affidavit of Tewhey Ex. D at 2 (hereinafter Tewhey Ex. ___ at ___); Third Amended Complaint Ex. 1, "The Presence of MTBE and Other Gasoline Compounds in Maine's Drinking Water: A Preliminary Report" (Oct. 13, 1998) at 2 (hereinafter Maine MTBE Report at ___); Sacco Ex. 2 at 2.

[5] RFG containing MTBE is referred to as MTBE RFG.

RFG program), other areas with less severe ozone pollution are allowed to "opt in" to the program. 42 U.S.C.A. § 7545(k)(6) (1995). As of July of 1997, all or parts of eighteen states and the District of Columbia were participating in the RFG program, either because they were required to or because they opted in to the program. Sacco Ex. 23 at 3. Maine is not required to participate in the federal RFG program. *Id*. at 5. On June 26, 1991, then Governor John McKernan petitioned the EPA to have the entire State of Maine opt-in to the program. *Id*. However, because only nonattainment areas are allowed to participate in the program, the EPA only allowed seven of Maine's counties to opt-in, effective January 1, 1995. *Id*. These counties were: York, Cumberland, Sagadahoc, Kennebec, Androscoggin, Knox, and Lincoln. *Id*. In November of 1994 these counties began selling 11% MTBE RFG. Sacco Ex. 2 at 2, Ex. 22 at 4. Many gas stations outside of those counties were forced to sell MTBE RFG because gasoline suppliers found it difficult and costly to provide two separate products. Third Amended Complaint ¶ 58 (hereinafter Complaint ¶ ___).

MTBE is used exclusively as an octane enhancer in gasoline. Tewhey Ex. D at 1. It can be released into the environment in several different ways.

> It may be released during refueling at service stations, in the exhaust emissions from vehicles, or from point sources such as leaking underground storage tanks or spills. When MTBE is released to the air, it can mix with precipitation and eventually be carried to ground water or surface water. It can also move from leaks or spills directly to ground water or surface water.

Sacco Ex. 23 at 23. "MTBE is very soluble in water, relatively mobile in soils and ground water, and resistant to degradation." *Id*. It is soluble in water at 4.3%.

4

Tewhey Ex. D at 1. Other gasoline components are relatively insoluble in water, such as benzene (0.18%), toluene (0.05%), and xylene (0.02%). *Id.* Thus, MTBE is twenty-four (24) times more water soluble than benzene which is the second most water soluble component in gasoline. *Id.* at 3. As a result of its increased solubility, when gasoline containing MTBE is spilled, the MTBE spreads both further and faster than the other components in gasoline. *Id.* at 1, 10. Once MTBE is in groundwater, it travels with the water with its concentrations diminishing as distance from the spill increases. *Id.* at 4. Because of MTBE's mobility in groundwater, concentrations of the chemical recorded in a well one week may be quite different the following week. *Id.* at 9.

In the spring of 1998, several incidents of MTBE groundwater contamination in Maine demonstrated that even "small spills of gasoline unrelated to underground or above ground fuel storage tank leaks could significantly impact a water source." Maine MTBE Report at 2. A gasoline leak from an overturned car was found to be the likely source for the contamination of twenty-four (24) domestic wells within 2,200 feet of the spill. Ten of these wells had MTBE levels exceeding 100 parts per billion (ppb).[6] *Id.* At the Whitefield elementary school, a small gasoline spill led to the removal of eight yards of contaminated soil and required the discontinuance of the school's well for drinking water. The well had peak MTBE concentration levels of 800 ppb. *Id.* In Windham, surface spills and tank overfills at

---

[6] The State of Maine currently has a health-based drinking water standard of 35 ppb of MTBE and the Maine Department of Environmental Protection (MDEP) has established a 25 ppb action level for remediation. Maine MTBE Report at 2, Summary.

5

a convenience store contaminated nearby wells even though the facility was constructed in compliance with current environmental controls. *Id*. "Most notable with all three of these spills, was the presence of only MTBE in contaminated water." *Id*.

In response to these events, Governor King ordered state health and environmental agencies to conduct a study of the occurrence and concentrations of MTBE in Maine's drinking water supplies by sampling 1000 private residential water supplies and all public water supplies. Maine MTBE Report at 2. Ultimately, 951 randomly selected household wells and 793 public water sources were tested for the presence of five gasoline components: MTBE, benzene, toluene, ethyl benzene, and xylenes. *Id*. at Summary. MTBE was detected in 15.8% (150) of the private wells that were tested. *Id*. Of these wells testing positive for MTBE, 1.1% had MTBE levels exceeding the Maine drinking water standard of 35 ppb. *Id*. Statewide, this figure means that approximately 1,000 to 4,300 private wells in Maine exceed the State's standard. *Id*. Of all the chemicals tested for, MTBE was the most prevalent contaminant found in private water supplies.[7] *Id*. at Figure 1. In regards to the public water supplies, 16% were contaminated with MTBE although none exceeded the State standard of 35 ppb.[8] *Id*. at Summary. Upon receiving the results of this

---

[7] The second most prevalent contaminant was Toluene, which was found in 2.1% of the private wells tested. *Id*. at Figure 1.

[8] As with the private water supplies, MTBE was the most prevalent contaminant found. The second most prevalent contaminant was Toluene, which was found in 13.1% of the public water supplies. *Id*. at Figure 3.

study in the fall of 1998, Governor King petitioned the EPA to opt-out of the RFG program. Sacco Ex. 1; *see* 40 C.F.R. § 80.72 (1999). The EPA granted this request in October of 1998 and beginning February 1, 1999 MTBE RFG was no longer sold in Maine. Sacco Ex. 1.

## II. Procedural History

Plaintiffs instituted this class action lawsuit on October 8, 1998 alleging that "[i]n November 1994, defendants, who knew of the threat posed by MTBE to groundwater, introduced and/or promoted the use of high MTBE-content reformulated gasoline" in Maine. Complaint ¶ 3. They allege that as a result of the introduction and use of MTBE RFG in Maine and the defendants' concomitant failure to warn, their wells have been contaminated or run the risk of being contaminated with MTBE. *Id.* Plaintiffs' eight count complaint asserts the following claims: (1) strict liability for failure to warn in violation of 14 M.R.S.A. § 221 (1980); (2) strict liability for misrepresentations under the *Restatement (Second) of Torts* § 402B (1965); (3) unfair and deceptive trade practices in violation of 5 M.R.S.A. § 207 (1989); (4) negligence; (5) negligent misrepresentation; (6) civil conspiracy; (7) fraud; and (8) punitive damages. They seek, among other things, an order requiring defendants to pay for court-approved testing of all private groundwater supplies on the real property of class members which have not been tested within the last calendar year, compensatory damages for lost property value and for the cost of cleaning up their wells which are contaminated with MTBE, and punitive damages. Shortly after plaintiffs filed their complaint, defendants ARCO

7

Chemical and Lyondell Chemical Company filed a Notice of Removal to the U.S. District Court. The District Court remanded the case back to this court in May of 1999.

Following remand, on August 30, 1999, this court dismissed the claims against defendants Patricia Aho, American Petroleum Institute, Nancy Balter, Ph.D., Oxygenated Fuels Association, and George Smith pursuant to Maine's anti-SLAPP statute, 14 M.R.S.A. § 556 (Supp. 1999). This court found that the claims against these defendants were based on their exercise of their right to petition the government as protected by the United States and Maine Constitutions. *See* U.S. Const. amend. I; Me. Const. art. I, § 15. This court also denied, in part, defendant Atlantic Richfield's M.R. Civ. P. 12(b)(6) motion to dismiss for failure to state a claim, finding that the claims against Atlantic Richfield were based on more than just the company's exercise of its right to petition the government. Finally, this court denied Atlantic Richfield's motion to dismiss for lack of personal jurisdiction.

Currently before the court is plaintiffs' motion for class certification pursuant to M.R. Civ. P. 23. Plaintiffs seek certification of two subclasses, a "Verified Contaminated Well Subclass" and an "Untested Well Subclass."[9] The Contaminated Subclass is defined as including:

---

[9] Rule 23(c)(4) provides that "a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly." Each subclass must independently meet the requirements of Rule 23 in order to proceed as a class action. *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981); *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1129 n.38 (7th Cir. 1979). Failure of a particular subclass to meet the requirements of Rule 23 will "either require the dismissal of the action with respect to the subclass or force the action to proceed with regard to the members of the subclass on an individual basis." *Betts*, 659 F.2d at 1005.

[A]ll persons or entities who during the class period from November 1, 1994 to present owned or had an interest in property in Maine and were consumers, other than resellers, of Defendants' MTBE or MTBE RFG and have had water tests verifying that their well or ground water is contaminated with MTBE in unacceptable concentrations.

Complaint ¶ 106A. The named representatives for this class are Michael Millett, Cathy Lemar, and Richard Lemar. *Id.* The Untested Subclass is defined as including:

[A]ll persons or entities who presently own or have an interest in property in Maine, and who 1) have been consumers, other than resellers, of Defendants' MTBE or MTBE RFG; 2) rely on ground water from the property for drinking and/or other household uses and 3) have not have their water tested for the presence of MTBE.

Complaint ¶ 106B. The named representatives for this class are Victoria Emmons and Monique Leamon.[10] *Id.*; Order dated August 19, 1999 granting plaintiffs' motion to add Monique Leamon. Various individuals and all claims for personal injuries

---

[10] Defendants have argued that Emmons and Leamon lack standing to pursue this action. In the context of class actions, the named plaintiffs must first show that they have individual standing. 1 Herbert Newberg and Alba Conte, *Newberg on Class Actions* § 2.05, at 2-29 (3d ed. 1992) (hereinafter __ *Newberg* § __, at __). "Once threshold individual standing by the class representative is met, a proper party to raise a particular issue is before the court, and there remains no further separate class standing requirement in the constitutional sense." *Id.* In Maine, a party has standing to sue if he has "a sufficient personal stake in the controversy, at the initiation of the litigation, to seek a judicial resolution of the controversy." *Madore v. Maine Land Use Regulation Comm'n*, 1998 ME 178, ¶ 8, 715 A.2d 157, 160. "The 'gist of the question of standing' is whether the party seeking review has a sufficient personal stake in a justiciable controversy to assure the existence of that 'concrete adverseness' that facilitates diligent development of the legal issues presented." *Halfway House, Inc. v. City of Portland*, 670 A.2d 1377, 1380 (Me. 1996) (quoting *Flast v. Cohen*, 392 U.S. 83, 99 (1968)). Emmons and Leamon allege that they own or have an interest in property in Maine and that, on that property, they rely on groundwater for drinking and other household purposes. They allege that as the result of the defendants' actions their groundwater supply is in danger of being contaminated with MTBE. This threat is not abstract or conjectural as the record at this point in the litigation reveals that approximately 15.8% of Maine's wells are currently contaminated with MTBE. Maine MTBE Report at Summary. Moreover, MTBE's water solubility facilitates groundwater pollution and supports the fact that Emmons and Leamon's groundwater supply is in danger of being contaminated. Considering this threat to Emmons and Leamon's groundwater supply, this court finds that they have met the threshold requirement of standing. However, they must still show that the additional requirements of Rule 23 have been met before they will be allowed to represent the claims of the members of the Untested Subclass. 1 *Newberg* § 2.05, at 2-29 - 2-30.

have been specifically excluded from the proposed classes. *See* Complaint ¶ 107. Plaintiffs seek certification of the Contaminated Subclass under Rule 23(b)(3) and certification of the Untested Subclass under Rule 23(b)(2).[11]

## III. Discussion

### A. M.R. Civ. P. 23 - General Standards for Class Certification

M.R. Civ. P. 23(a) lists four prerequisites to a class action, all of which must be met:

1. The class is so numerous that joinder of all members is impracticable;
2. There are questions of law or fact common to the class;
3. The claims or defenses of the representative parties are typical of the claims or defenses of the class; and
4. The representative parties will fairly and adequately protect the interests of the class.

In addition to satisfying these four prerequisites, the proposed class action must fall into one of the three subsections of Rule 23(b). Class certification is conditional. If a class is certified, it may be altered, expanded, subdivided, or vacated as the case progresses toward resolution on the merits. *See* M.R. Civ. P. 23(c)(1), 23(c)(4)(B). Although the Law Court has not had the opportunity to address the requirements of

---

[11] Initially, plaintiffs asserted that certification would also be appropriate under Rule 23(b)(1). *See* Complaint ¶ 115; Pls' Memorandum in Support of Class Certification at 23-25 (hereinafter Pls' Memo. at __). However, in their Reply Memorandum, no counter-argument is offered in response to defendants' assertion that certification under Rule 23(b)(1) would be inappropriate and, in fact, plaintiffs assert that they "have proposed that only the Untested Well Subclass be certified as a mandatory class under Rule 23(b)(2), and that the Verified Contaminated Well Subclass be certified as an opt-out class under Rule 23(b)(3)." Plaintiffs' Reply Memorandum in Support of Class Certification at 16 (hereinafter Pls' Reply Memo. at __); *see also* Pls' Reply Memo. at 14 ("Plaintiffs have proposed certification of the Verified Contaminated Well Subclass under Rule 23(b)(3) and the Untested Well Subclass under Rule 23(b)(2)."). Accordingly, this court finds that plaintiffs have abandoned their argument that certification would be appropriate under Rule 23(b)(1) and therefore will only consider whether certification is appropriate under Rule 23(b)(2) for the Untested Subclass and under Rule 23(b)(3) for the Contaminated Subclass.

10

Rule 23, the Superior Court has in *Karofsky v. Abbott Laboratories*, CV-95-1009 (Me. Super. Ct., Cum. Cty., Oct. 15, 1997) (Saufley, J.). The parties rely on *Karofsky* in their respective memorandums, recognizing its persuasive authority.

A "rigorous analysis" of the Rule 23 prerequisites must be conducted before a proposed class can be certified. *General Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 161 (1982).[12] The determination of class certification is committed to the broad discretion of the court. *Castano v. American Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996); *Karofsky* at 5 (citing *Anderson v. City of Albuquerque*, 690 F.2d 796, 799 (10th Cir. 1982)). The Tenth Circuit has noted that:

> The discretion granted to the trial court on the certification issue leaves the decision as to what method of trial is most efficient primarily to the court that is in the best position to determine the facts of the case, to appreciate the consequences of alternative methods of resolving the issues of the case and that is in the best position to select the most efficient method for their resolution.

*Boughton v. Cotter Corp.*, 65 F.3d 823, 826 (10th Cir. 1995). The party seeking certification bears the burden of demonstrating under a "strict burden of proof" that all of the requirements of Rule 23 are clearly met. *Rex v. Owens ex rel Okla.*, 585 F.2d 432, 435 (10th Cir. 1978); *see also Wilcox v. Petit*, 117 F.R.D. 314, 316 (D.Me. 1987) (noting that plaintiffs bear the burden of establishing the right to maintain a class

---

12 The Law Court has "frequently relied on federal interpretations of the identical counterparts to the Maine Rules of Civil Procedure." *Mondello v. General Elec. Co.*, 650 A.2d 941, 944 n. 3 (Me. 1994); *see also Maine Cent. R.R. Co. v. Bangor & Aroostook R.R. Co.*, 395 A.2d 1107, 1114 (Me. 1978) ("[W]e value constructions and comments on the federal rule as aids in construing our parallel provision."); *Wormelle v. George*, 325 A.2d 4, 5 n.3 (Me. 1974) (noting that federal authority provides "valuable guidance"). The text of Maine Rule 23 is identical to the text of federal Rule 23. Considering this similarity and the almost complete lack of Maine case law on class actions, this court will rely extensively on federal case law in ruling on this motion.

11

action). The allegations of the complaint are to be taken as true for purposes of determining whether a class should be certified. *Thompson v. American Tobacco Co.*, 189 F.R.D. 544, 549 (D.Minn. 1999).

In determining whether a class should be certified, the court must not evaluate or decide the merits of plaintiffs' claims, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974). However, a court "certainly may look past the pleadings to determine whether the requirements of rule 23 have been met. Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Castano*, 84 F.3d at 744.[13] The court is allowed "to consider evidence which goes to the requirements of Rule 23 even though the evidence may also relate to the underlying merits of the case." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992); *see also Elliott v. ITT Corp.*, 150 F.R.D. 569, 573 (N.D. Ill. 1992) (noting that the court "takes into account the substantive elements of plaintiff's claims and it looks at the proof necessary to those elements so as to envision the form trial on those issues would take"). Thus, this court must "walk the fine line between a rigorous analysis of the basic claims and

___

[13] See also *Coopers & Lybrand v. Livesay*, 437 U.S. 463 (1978) wherein the Supreme Court commented that "the class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Id.* at 469 (quoting *Mercantile Nat. Bank v. Langdeau*, 371 U.S. 555, 558 (1963)). The Court further noted:

> Evaluation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims. The typicality of the representative's claims or defenses, the adequacy of the representative, and the presence of common questions of law or fact are obvious examples. The more complex determinations required in Rule 23(b)(3) class actions entail even greater entanglement with the merits.

*Id.* at 469 n.12.

method of proof presented by the plaintiffs and the inappropriate delving into an assessment of the merits of those claims." *Karofsky* at 6. Ultimately, this court must be convinced that plaintiffs have met their burden, by a preponderance of the evidence, of showing that each subclass meets the requirements in Rule 23(a) and at least one of the 23(b) subsections. *Id.*

### B. M.R. Civ. P. 23(a)

#### 1. M.R. Civ. P. 23(a)(1) - Numerosity

Under Rule 23(a)(1), plaintiffs must show that each subclass "is so numerous that joinder of all members is impracticable." M.R. Civ. P. 23(a)(1). Evidence of exact class size or identity of class members is not required to satisfy the numerosity requirement. *Robidoux v. Celani*, 987 F.2d 931, 935 (2nd Cir. 1993). Rather, plaintiffs "must show some evidence of or reasonably estimate the number of class members." *Id.* (quoting *Barlow v. Marion County Hosp. Dist.*, 88 F.R.D. 619, 625 (M.D. Fla. 1980)). "Where numerosity is a close question, the courts typically will find that numerosity exists and that a later decertification can occur if certification was determined to have been erroneous." *Karofsky* at 12 (citing *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983)).

Plaintiffs rely on the figures reported in the Maine MTBE Report as evidence that the numerosity requirement is met. The report states that census data shows that there are 245,831 households in Maine that rely on wells for housewater. Maine MTBE Report at 12. Plaintiffs assert that the Untested Subclass would be comprised of "roughly the same number of individuals minus the relative

13

handful" of property owners who have had their wells tested for MTBE. Pls' Memo. at 9. Regarding the Contaminated Subclass, the Maine MTBE Report estimates that between 1,400 to 4,300 of Maine's private wells do not meet the State's standard for drinking water due to MTBE contamination. Maine MTBE Report at 12. Defendants do not dispute that this requirement is met. In fact, they acknowledge that the plaintiffs' suit implicates "tens of thousands" of potential sites for pollution.[14] The numerosity requirement is met for both of the proposed subclasses.

2.      **M.R. Civ. P. 23(a)(2) - Commonality of Questions of Law or Fact**

Rule 23(a)(2) requires the plaintiffs to show that "there are questions of law or fact common to the class." This requirement is not "demanding." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999), *cert. denied*, No. 99-1036, 2000 WL 197520, (U.S. Feb. 22, 2000). It is not necessary for plaintiffs to "demonstrate that identical questions of law or fact are common to the class." *Karofsky* at 12-13, *see also Wilcox*, 117 F.R.D. at 317 ("It is not necessary that all questions of law or fact involved in the dispute be shared commonly."). Rather, this requirement is met if "plaintiffs' grievances share a common question of law or of fact." *Marisol A. ex rel Forbes v. Giuliani*, 126 F.3d 372, 376 (2nd Cir. 1997). The test "is qualitative rather than quantitative, that is, there need be only a single issue common to all members of the class." *In re American Med. Sys., Inc.*, 75 F.3d 1069,

---

[14] *See* Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification at 29 (hereinafter Defs' Opposition at __).

1080 (6th Cir. 1996) (quoting 1 *Newberg* § 3.10, at 3-50); *see also Lightbourn v. County of El Paso, Tex.*, 118 F.3d 421, 426 (5th Cir. 1997) ("The commonality test is met when there is at least one issue, the resolution of which will affect all or a significant number of the putative class members."). Defendants do not dispute that this requirement is met. The members of the proposed subclasses have at least the following issues in common:

1)   whether the defendants knew of the danger MTBE poses to groundwater and, if so, when did they have this knowledge;

2)   whether the defendants made misrepresentations regarding or failed to warn of the danger MTBE poses to groundwater; and

3)   if the defendants failed to issue appropriate warnings or made misrepresentations, did they conspire and act in concert in doing so.

This list of common issues is sufficient to meet the requirement of commonality in Rule 23(a)(2). Therefore, this requirement is met for both subclasses.

### 3.    M.R. Civ. P. 23(a)(3) - Typicality

Rule 23(a)(3) requires the claims or defenses of the representative parties to be typical of the claims or defenses of the class. This requirement is "intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Baby Neal ex rel Kanter v. Casey*, 43 F.3d 48, 57 (3rd Cir. 1994). "Like commonality, the test for typicality is not demanding." *Mullen*, 186 F.3d at 625. It "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Id.* (quoting *Lightbourn*, 118 F.3d at 426). A

15

named plaintiff's claim is typical if "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robidoux*, 987 F.2d at 936. "[F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Barnes v. American Tobacco Co.*, 161 F.3d 127, 141 (3rd Cir. 1998) (quoting 1 Newberg § 3.15, at 3-78), *cert. denied*, 119 S.Ct. 1760 (1999).[15] The claims of the representative parties do not need to be identical in order for this requirement to be met. *Karofsky* at 14 (citing *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3rd Cir. 1985); *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984)). Defendants argue that this requirement is not met.

Although each of the named plaintiffs in the proposed subclasses might come before this court with significant factual differences underlying their claims, all of them base their claims against the defendants on the same legal theories. They all claim that the defendants manufactured MTBE knowing of the danger it posed to groundwater, that despite this knowledge they promoted and sold MTBE without warning of that danger, and that, as a result of this failure to warn, their water has been or is in jeopardy of being contaminated with MTBE. Further, they claim that the defendants made misrepresentations regarding the properties of MTBE in order to promote its sale and that the defendants conspired and acted in concert in making

---

[15] *See also Baby Neal*, 43 F.3d at 58 ("[E]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories."); *Karofsky* at 14 ("It has been held that a strong similarity of legal theory will satisfy typicality requirements even where substantial factual differences exist.").

16

those misrepresentations and omissions regarding MTBE. There is no divergence of legal theory among the named plaintiffs. Their claims are typical of those held by the other class members because they "all contain a common 'core of allegation.'" *Riordan v. Barney*, 113 F.R.D. 60, 63 (N.D. Ill. 1986) (quoting *Robert E. v. Lane*, 530 F.Supp. 930, 943 (N.D. Ill. 1981)). The claims of the named plaintiffs and the class members all arise and are based on an alleged single course of conduct undertaken by the defendants - the promotion and sale of MTBE without warnings regarding the danger posed to groundwater by that product when they knew of those dangers. "[C]ases challenging the same unlawful conduct that affects both the named plaintiffs and the rest of the putative class usually satisfies the typicality requirement, despite disparities in the individual factual scenarios." *Cullen v. Whitman Med. Corp.*, 188 F.R.D. 226, 230 (E.D. Pa. 1999) (citing *Baby Neal*, 43 F.3d at 58). There would be, without dispute, factual differences between the named plaintiffs and the class members with regard to issues such as reliance, causation, and their own potential fault in causing the contamination or risk thereof, however, such individual factual differences, although relevant to other considerations on class certification, do not defeat a determination of typicality. *Karofsky* at 15.

Several courts have found that the typicality requirement is not met when the named plaintiffs are subject to unique defenses that threaten to play a major role

17

in the litigation.[16] "The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer." *J. H. Cohn & Co.*, 628 F.2d at 999. In order to defeat typicality, the specific defense must be "unique, arguable and likely to usurp a significant portion of the litigant's time and energy." *Danis v. USN Communications, Inc.*, 189 F.R.D. 391, 395 (N.D. Ill. 1999) (quoting *McNichols v. Loeb Rhoades & Co.*, 97 F.R.D. 331, 334 (N.D. Ill. 1982)); *see also Hanon*, 976 F.2d at 508. In the instant case, the named plaintiffs are not subject to unique defenses but rather they, like the rest of the members of the proposed subclasses, are subject to defenses which require the determination of issues on an individual basis. For instance, defendants argue that for each plaintiff a determination will have to be made as to whether they were "self-polluters," i.e., whether they were contributorily negligent in causing the contamination of their well. This defense is not unique to any particular plaintiff because, by defendants' own admission, it will have to be considered for each plaintiff in this action. *See* Defs' Opposition at 25. Therefore, this defense cannot defeat typicality.[17] This court finds that the typicality requirement in Rule 23(a)(3) is met.

---

[16] *See In re Milk Prod. Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999), *petition for cert. filed*, (U.S. Feb. 11, 2000) (No. 99-1364); *Hanon*, 976 F.2d at 508; *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990); *J. H. Cohn & Co. v. American Appraisal Assoc., Inc.*, 628 F.2d 994, 998-99 (7th Cir. 1980).

[17] However, the fact that the proof required for this defense will have to be individualized, focusing on the actions of each class member, is relevant to the predominance inquiry under Rule 23(b)(3). *See infra* Part III.C.1.a.iii.

### 4. M.R. Civ. P. 23(a)(4) - Adequacy of Representation

Rule 23(a)(4) requires the plaintiffs to show that "the representative parties will fairly and adequately protect the interests of the class." M.R. Civ. P. 23(a)(4). This provision requires a showing that "class counsel is qualified, experienced and generally able to conduct the litigation" and that there is "no conflict of interest between the named plaintiffs and other members of the plaintiff class." *Marisol A. ex rel Forbes*, 126 F.3d at 378; *see also General Tel. Co. of S.W.*, 457 U.S. at 157 n.13; *Karofsky* at 15-16. Regarding the first requirement, plaintiffs' counsel has had extensive experience in litigating mass tort and product liability class actions. They have demonstrated a willingness to vigorously and competently advocate for the interests of the proposed classes. There is no dispute, nor could there be, that plaintiffs' counsel are qualified to handle this litigation.

However, defendants do argue that the second requirement of subsection (a)(4), that there be no conflict of interest between the named representatives and the other members of the class, is not met because plaintiffs have specifically excluded from this action all claims for personal injuries and claims against the "actual spillers." They argue that this willingness to cast aside claims makes plaintiffs inadequate to represent the unnamed class members. Plaintiffs respond arguing that the way the classes have been created, class members who have claims for personal injury or against actual spillers will have the ability to opt out of the litigation in order to protect their claims.

Several courts have recognized that a named representative is inadequate to represent a class where that representative's waiver or abandonment of a claim places the class members at risk of being precluded from raising that claim in a subsequent law suit based on the doctrine of res judicata.[18] Under plaintiffs' proposed plan, they have specifically excluded claims for personal injury in this action. Complaint ¶ 107. Plaintiffs argue that members of the Contaminated Subclass are given the opportunity to opt out and that this is sufficient to protect their rights regarding their claims for personal injury. This is true with respect to those class members who choose to opt out.[19] However, the right to opt out does nothing to protect the unraised personal injury claims of those class members who decide not to opt out. *Chmieleski*, 71 F.R.D. at 148, n.25 (noting that res judicata "would most likely prevent class members who failed to opt out of plaintiffs' proposed class action . . . from presenting the remaining portions of their damage claims in an individual action against the defendants"). For these class members, the issue is whether the class representatives' failure to raise claims for personal injury in this action has jeopardized their ability to raise these claims in a

---

[18] *See Thompson*, 189 F.R.D. at 550-51; *Pearl v. Allied Corp.*, 102 F.R.D. 921, 923-24 (E.D. Pa. 1984); *Feinstein v. Firestone Tire and Rubber Co.*, 535 F.Supp. 595, 606 (S.D. N.Y. 1982); *Chmieleski v. City Products Corp.*, 71 F.R.D. 118, 149, n.25 (W.D. Mo. 1976); *Small v. Lorillard Tobacco Co.*, 679 N.Y.S.2d 593, 601-602 (N.Y. App. Div. 1998), *aff'd*, 720 N.E.2d 892 (N.Y. 1999).

[19] *See Eisen*, 417 U.S. at 176 (noting that in the context of a (b)(3) action, "the Rule was intended to insure that the judgment, whether favorable or not, would bind all class members who did not request exclusion from the suit."); *Robinson v. Sheriff of Cook County*, 167 F.3d 1155, 1157 (7th Cir. 1999), *cert. denied*, 120 S.Ct. 71 (1999); *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 388 (D.Colo. 1993) ("[W]here a class has been certified under (b)(3), class members may opt out of the class and, a judgment will not have a *res judicata* effect on those who elect to do so.").

subsequent lawsuit. If their claims have been jeopardized, then the Contaminated Subclass representatives would have to be found inadequate.

This court finds that the attempts by the Contaminated Subclass representatives to exclude personal injury claims from this lawsuit may, in fact, jeopardize the subclass members' ability to bring those claims in a later suit. Under Maine law, res judicata applies not only to claims which were litigated in the first action, but also to claims which "might have been litigated in the first action." *Camps Newfound/Owatonna Corp. v. Town of Harrison*, 1998 ME 20, ¶ 11, 705 A.2d 1109, 1113. This court cannot predetermine the res judicata effect of a judgment in this action, rather, the effect of the judgment can only be tested in a subsequent action. Fed. R. Civ. P. 23(c)(3) advisory committee note, 39 F.R.D. 95, 106. Thus, even if this court allowed plaintiffs to reserve their personal injury claims, "whether a subsequent court would honor such a reservation is, at best, undeterminable at this time. A subsequent court may very well find that individual injury and damage claims should have been litigated in this lawsuit." *Thompson*, 189 F.R.D. at 550-51. The possible prejudice of losing personal injury claims is "simply too great for [this] Court to conclude that the named Plaintiffs' interests are aligned with those of the class." *Id*. at 551. Accordingly, this court finds that Michael Millett, Richard Lemar, and Cathy Lemar are inadequate representatives of the Contaminated Subclass.

This court also has concerns regarding the adequacy of the representatives of the Untested Subclass. Under plaintiffs' proposed plan, the members of this class

21

whose wells are found to be contaminated over the level set by this court in the third stage of this litigation will be moved into the Contaminated Subclass and then given the opportunity to opt out. However, those Untested Subclass members whose wells are contaminated with MTBE, but at a level less than that set by this court, will remain in the Untested Subclass. Plaintiffs seek certification of this subclass under Rule 23(b)(2). "Class members in an action where a class has been certified under (b)(2) do not have the option of opting out of the class and a judgment will be binding and will have a *res judicata* effect as to the whole class." *Cook*, 151 F.R.D. at 388. Therefore, the Untested Subclass members who have MTBE contamination in their wells, but not at sufficient levels to move them into the Contaminated Subclass, will not be able to opt out of this litigation. As a result, not only will they be precluded in this action from recovering compensatory damages to cover the cost of cleaning up their wells, but they will also be precluded from protecting any claims they may have for personal injury damages. Moreover, there is a significant risk that any subsequent lawsuits filed by these class members against the defendants in this action would be barred by res judicata. *Id*. This court finds that Victoria Emmons and Monique Leamon are inadequate representatives of the Untested Subclass.

## C.   M.R. Civ. P. 23(b)

### 1.   M.R. Civ. P. 23(b)(3)

Plaintiffs seek certification of the Contaminated Subclass pursuant to M.R. Civ. P. 23(b)(3). The Advisory Committee Notes indicate that subdivision (b)(3) was

intended for "those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Fed. R. Civ. P. 23(b)(3) advisory committee note, 39 F.R.D. at 102-103. In order to certify a class under Rule 23(b)(3), the court must find that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." M.R. Civ. P. 23(b)(3). "Whether, on balance, individual issues predominate[] over common issues and whether the advantages of a class action outweigh[] the potential problems such as case manageability and jury confusion of multiple issues are determinations that are generally best left to the trial court." *Boughton*, 65 F.3d at 828. In determining whether the predominance and superiority requirements of Rule 23(b)(3) are met, the Rule directs the court to consider the following:

(A) The interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) The difficulties likely to be encountered in the management of a class action.

*Id.* This court, in reaching its conclusions on whether certification is proper under subdivision (b)(3), has been guided by these factors.

### a. Predominance

The predominance element in Rule 23(b)(3) is closely related to the commonality requirement in subdivision (a)(2) in that both require an inquiry into whether there are questions of law or fact common to the class. However, the predominance requirement is "far more demanding" than the commonality requirement, *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 623-24 (1997), in that it requires that the common questions of law or fact *predominate* over the individual questions which must be decided. "To predominate, '[i]t is not enough that the claims arise out of a common nucleus of operative fact. Instead, the common questions must be central to all the claims. . . . [C]ommon issues are predominant only if their resolution would provide a definite signal of the beginning of the end.'" *Puerto Rico v. M/V Emily S,* 158 F.R.D. 9, 15 (D.P.R. 1994) (quoting *Mattoon v. City of Pittsfield,* 128 F.R.D. 17, 20 (D.Mass. 1989)); *see also Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468, 472 (5th Cir. 1986) ("In order to 'predominate,' common issues must constitute a significant part of the individual cases."). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc.,* 521 U.S. at 623. "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." *Valentino v. Carter-Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir. 1996).

Many courts, in considering Rule 23(b)(3)'s predominance requirement in the context of a case involving a mass tort, have noted and relied upon the Federal Advisory Committee's caution against certifying a class in such cases:

> A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.

Fed. R. Civ. P. 23(b)(3) advisory committee note, 39 F.R.D. at 103. *See Amchem Products, Inc.*, 521 U.S. at 625; *Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 627-28 (3rd Cir. 1996), *aff'd sub nom. Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997); *Insolia v. Philip Morris Inc.*, 186 F.R.D. 535, 546 (W.D. Wis. 1998); *Emig v. American Tobacco Co.*, 184 F.R.D. 379, 388 (D.Kan. 1998); *Satsky v. Paramount Communications, Inc.*, No. Civ. A. 90-S-1561, 1996 WL 1062376, at *14 (D.Colo. Mar. 13, 1996); *Thomas v. FAG Bearings Corp.*, 846 F.Supp. 1400, 1404 (W.D. Mo. 1994).

In *Amchem Products, Inc.*, the Supreme Court recognized that, even in the face of this comment by the Advisory Committee, "mass tort cases arising from a *common cause or disaster* may, depending upon the circumstances, satisfy the predominance requirement." 521 U.S. at 625 (emphasis added). Many courts have noted the distinction between mass tort cases arising from a common cause or disaster, such as an airplane crash, and mass tort cases where there is no single happening or accident, such as products liability actions, and have found that certification in the later case is frequently inappropriate because individual issues

25

predominate over common issues as the result of there being no single event upon which the defendants' liability is premised. For instance, in *Georgine*, the Third Circuit noted that while "mass torts involving a single accident are sometimes susceptible to Rule 23(b)(3) class action treatment, the individualized issues can become overwhelming in actions involving long-term mass torts (i.e., those which do not arise out of a single accident)." 83 F.3d at 628. The Ninth Circuit made the following comments in *In re Northern District of California Dalkon Shield IUD Products Liability Litigation*, 693 F.2d 847 (9th Cir. 1982), *cert. denied*, 459 U.S. 1171 (1983):

> In the typical mass tort situation, such as an airplane crash or a cruise ship food poisoning, proximate cause can be determined on a class-wide basis because the cause of the common disaster is the same for each of the plaintiffs.
>
> In products liability actions, however, individual issues may outnumber common issues. No single happening or accident occurs to cause similar types of physical harm or property damage. No one set of operative facts establishes liability. No single proximate cause applies equally to each potential class member and each defendant. Furthermore, the alleged tortfeasor's affirmative defenses (such as failure to follow directions, assumption of the risk, contributory negligence, and the statute of limitations) may depend on facts peculiar to each plaintiff's case.

*Id.* at 853. The Sixth Circuit commented in *Sterling v. Velsicol Chemical Corporation*, 855 F.2d 1188 (6th Cir. 1988) that:

> In complex, mass, toxic tort accidents, where no one set of operative facts establishes liability, no single proximate cause equally applies to each potential class member and each defendant, and individual issues outnumber common issues, the district court should properly question the appropriateness of a class action for resolving the controversy. However, where the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct

26

which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy.

*Id.* at 1197.[20] What is evident from these cases is that the plaintiffs' burden of showing that the predominance requirement in subdivision (b)(3) has been met in a mass tort case involving no single catastrophic event is much more difficult to meet than it is in a case involving such an event. However, this does not mean that that burden cannot be met. As the Supreme Court noted in *Amchem Products, Inc.*, "the text of the rule does not categorically exclude mass tort cases from class certification, and district courts, since the late 1970s, have been certifying such cases in increasing number. The Committee's warning, however, continues to call for caution when individual stakes are high and disparities among class members great." 521 U.S. at 625 (citations omitted).

### i.    Reliance

Many courts have recognized that class certification is inappropriate in cases where individualized proof of reliance is required. *Castano*, 84 F.3d at 745 (according to case law in the Fifth Circuit and the Advisory Committee Notes to Rule 23(b)(3), a "fraud class action cannot be certified when individual reliance will be an issue"); *Thompson*, 189 F.R.D. at 552 ("It is widely recognized that individual proof of

---

[20] *See also Bethards v. Bard Access Sys., Inc.*, No. 94 C 1522, 1995 WL 75356, at *3 (N.D. Ill. Feb. 22, 1995); *In re Orthopedic Bone Screw Prod. Liab. Litig.*, No. Civ. A. 93-7074, 1995 WL 273597, at *10-11 (E.D. Pa. Feb. 22, 1995); *Blake v. Chemlawn Servs. Corp.*, Civ. A. No. 86-3413, 1988 WL 6151, at *3 (E.D. Pa. Jan. 26, 1988); *Mertens v. Abbott Lab.*, 99 F.R.D. 38, 42 (D.N.H. 1983); *Baker v. Wyeth-Ayerst Lab. Div.*, 992 S.W.2d 797, 800-801 (Ark. 1999); *Reed v. Philip Morris Inc.*, No. 96-5070, 1997 WL 538921, at *9 (D.C. Super. Ct. Aug. 18, 1997).

reliance precludes class certification.").[21] In the Advisory Committee's comments to Rule 23(b)(3), it is noted that "a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed." Fed. R. Civ. P. 23(b)(3) advisory committee note, 39 F.R.D. at 103.

Plaintiffs have brought claims against the defendants for negligent misrepresentation, fraud, and violation of *Restatement (Second) of Torts*, § 402B (1965). The negligent misrepresentation and fraud claims require plaintiffs to prove that they justifiably relied upon the defendants' alleged misrepresentations and omissions regarding the threat MTBE poses to groundwater and that this reliance caused their wells to be contaminated.[22] Section 402B of the *Restatement (Second)*

---

[21] *See also Anderberg v. Masonite Corp.*, 176 F.R.D. 682, 685 (N.D. Ga. 1997) ("Causes of action based on fraud are highly individualistic and are therefore often particularly ill-suited to class resolution."); *Satsky*, 1996 WL 1062376, at *14 (finding that class certification was not appropriate for plaintiffs' misrepresentation and concealment claims because each plaintiff will have to prove actual reliance on a specific statement or omission by the defendant); *Hurd v. Monsanto Co.*, 164 F.R.D. 234, 240 n.3 (S.D. Ind. 1995) (finding that plaintiffs' fraud claims were inappropriate for class treatment because each class member will have to prove what acts or omissions of the defendants he actually relied upon and how that reliance caused his injury); *Martin v. Dahlberg, Inc.*, 156 F.R.D. 207, 217 (N.D. Cal. 1994) (finding that common law claims of fraud and negligent misrepresentation raise individualized questions of reliance precluding class certification on these claims).

[22] The Law Court has adopted the formulation of negligent misrepresentation in the *Restatement (Second) of Torts*:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Chapman v. Rideout*, 568 A.2d 829, 830 (Me. 1990) (quoting *Restatement (Second) of Torts* § 552(1) (1977)). To sustain their claim for fraud, plaintiffs must show: (1) that the defendants made a false representation, (2) of a material fact, (3) with knowledge of its falsity or in reckless disregard of whether it is true or false, (4) for the purpose of inducing them to act in reliance upon it, and (5) they justifiably relied upon the representation as true and acted upon it to their damage. *Guiggey v. Bombardier*, 615 A.2d 1169, 1173 (Me. 1992).

28

*of Torts* requires plaintiffs to show that their justifiable reliance on the defendants' misrepresentations and omissions caused them physical harm.[23] Thus, even if plaintiffs could show that defendants were acting in concert to misrepresent to the public the dangers MTBE poses to groundwater, plaintiffs would still have to show, on an individual basis, that they relied on the misrepresentations and omissions made by the defendants and that they suffered an injury as a result of their reliance. Proof of reliance is an individual issue which will have to be tried separately for each plaintiff in order for him or her to prevail on these causes of action.

## ii.    Causation

To prevail on their claims for strict products liability, negligence, and violation of the Unfair Trade Practices Act, plaintiffs must prove a causal link between the contamination of their wells and defendants' misrepresentations and omissions regarding MTBE. Under strict products liability and negligence, defendants' conduct must be shown to have been a "substantial factor" in producing each plaintiff's injury.[24] Under the unfair trade practices claim, plaintiffs must

---

[23] The *Restatement (Second) of Torts* § 402B (1965) provides that:
One engaged in the business of selling chattels who, by advertising, labels, or otherwise, makes to the public a misrepresentation of a material fact concerning the character or quality of a chattel sold by him is subject to liability for physical harm to a consumer of the chattel caused by justifiable reliance upon the misrepresentation, even though:

    (a)    it is not made fraudulently or negligently, and
    (b)    the consumer has not bought the chattel from or entered into any contractual relation with the seller.

[24] A strict products liability action for failure to warn requires a three-part analysis: (1) whether the defendant held a duty to warn the plaintiff; (2) whether the actual warning on the product, if any, was inadequate; and (3) whether the inadequate warning proximately caused the plaintiff's injury. *Pottle v. Up-Right, Inc.*, 628 A.2d 672, 675 (Me. 1993). Under the third element, the

show that the injury they sustained was caused by the defendants' unfair and/or deceptive trade practices.[25]

The issue of causation presents a major obstacle for plaintiffs in their attempt to have this case certified as a class action because it cannot be proven on a class-wide basis. The actual cause of the MTBE contamination of each plaintiff's well will have to be addressed on an individual basis.[26] While there may be class members whose well contamination was specifically caused by the defendants' alleged failure to provide adequate warnings, there are likely to be many other class members whose wells were contaminated by other causes. For example, if there was a leaking

---

"manufacturer's failure to provide an adequate warning must be a substantial factor in bringing about the plaintiff's injury." *Id.* To prevail in a negligence action, the plaintiff must prove that the defendant had a "duty to conform to a standard of care and that the breach of that duty proximately caused an injury to the plaintiff." *Lewis v. Knowlton*, 1997 ME 12, ¶ 7, 688 A.2d 912, 913. "Negligence is actionable only if it proximately causes an injury to another - that is, if it 'is a *substantial factor* in bringing about the harm.'" *Taylor v. Hill*, 464 A.2d 938, 944 n.2 (Me. 1983) (quoting *Wing v. Morse*, 300 A.2d 491, 495-96 (Me. 1973)).

[25] Maine's Unfair Trade Practices Act makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 5 M.R.S.A. § 207 (1989). The injury caused by an unfair or deceptive act "must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided." *Tungate v. MacLean-Stevens Studios, Inc.*, 1998 ME 162, ¶ 11, 714 A.2d 792, 797. In order to establish that an act or practice is deceptive, the plaintiffs "must establish that the representations, omissions, or practices likely would mislead consumers, acting reasonably, to their detriment." *F.T.C. v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988), *quoted in Tungate*, 1998 ME 162, ¶ 11, 714 A.2d at 797.

[26] Many courts have denied certification because they found, among other things, that issues of causation must be decided on a individual basis. *See Barnes*, 161 F.3d at 145, 149; *Emig*, 184 F.R.D. at 389-90; *In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 220 (E.D. La. 1998); *O'Connor v. Boeing N. American, Inc.*, 180 F.R.D. 359, 381-82 (C.D. Cal. 1997), *class certification later granted on an amended complaint by* 184 F.R.D. 311 (C.D. Cal. 1997); *Arch v. American Tobacco Co.*, 175 F.R.D. 469, 488-89 (E.D. Pa. 1997); *Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90, 96 (W.D. Mo. 1997); *M/V Emily S*, 158 F.R.D. at 15; *Baker*, 992 S.W.2d at 801-802; *Reed*, 1997 WL 538921, at *9; *Geiger v. American Tobacco, Co.*, 696 N.Y.S.2d 345, 352 (N.Y. Sup. Ct. 1999).

30

underground storage tank in proximity to the wells of some of the class members, then a substantial factor in causing the contamination of those wells might be the fact that the storage tank had a leak, not that the defendants failed to provide a warning about the dangers of MTBE to groundwater. The contamination of other class members' wells may have been caused by the actions of their neighbors or some other third party. For instance, there is evidence in this case that third party defendant Wayne Conlan caused the contamination of Michael Millett's well when he was involved in a car accident which resulted in his gas tank being punctured. Yet other class members may have self-contaminated their own property even though they knew of the threat MTBE poses to groundwater. There is no one set of facts that could establish causation for each class member. *In re Dalkon Shield*, 693 F.2d at 853; *M/V Emily S*, 158 F.R.D. at 15. Consequently, even if the plaintiffs succeeded in establishing the fault or negligence of the defendants, they would still have the bulk of their cases to prove because any successful class member will still have to prove causation. *See M/V Emily S*, 158 F.R.D. at 15. Causation is an individual issue which will have to be tried separately for each plaintiff in order for him or her to prevail on their claims of strict products liability, negligence, and violation of the Unfair Trade Practices Act.

To the extent that plaintiffs seek to prove causation by merely showing that MTBE is highly water soluble, that it presents a grave threat to groundwater when it is spilled, and that the defendants knew of this threat but failed to warn the public,

31

they cannot do so. Such proof of "general causation"[27] will not satisfy their burden of showing that defendants' misrepresentations and failure to warn caused each individual plaintiff's well to be contaminated. "[A] finding of 'general causation' would do little to advance this litigation." *Smith*, 174 F.R.D. at 96 (quoting *Harding v. Tambrands, Inc.*, 165 F.R.D. 623, 630 (D.Kan. 1996)). This is because liability in this case will not turn on whether MTBE presents a significant risk to groundwater because of its inherent qualities and whether the defendants knew of this threat, but rather, liability will turn on whether the defendants' misrepresentations and omissions caused a particular plaintiff's well to be contaminated. This later inquiry will turn on numerous individual factors, rendering the issue of causation inappropriate for class disposition. *Id.*[28]

### iii.    Comparative Negligence

This court also finds that the defendants' affirmative defense of comparative negligence, 14 M.R.S.A. § 156 (1980), raises issues which must be determined on an

---

[27] "Causation in toxic tort cases is discussed in terms of general and specific causation. General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." *In re Breast Implant Litig.*, 11 F.Supp.2d 1217, 1224 (D.Colo. 1998) (citations omitted).

[28] *See also Arch*, 175 F.R.D. at 488-89 (finding that resolution of the general causation question of whether cigarettes can potentially cause the user to become addicted would accomplish nothing for any of the individual plaintiffs as the jury would still be required to determine for each class member whether he or she is addicted to cigarettes and, if so, whether defendants caused that addiction); *Mertens*, 99 F.R.D. at 42 ("Although there may be some advantage to litigation which establishes what the industry manufacturing DES knew at specified intervals of time concerning the deleterious effects of the drug, there is nothing to show that knowledge at a given point in time essentially settles anything with respect to liability to a particular claimant.").

individual basis.[29] In the strict products liability context, this defense requires the trier of fact "to compare the conduct of the seller of an unreasonably dangerous product with the contributorily negligent conduct of the plaintiff." *Austin v. Raybestos-Manhattan, Inc.*, 471 A.2d 280, 285 (Me. 1984). A plaintiff's failure to discover a defect in a product or to guard against the possibility of its existence is not a defense to strict products liability under section 221. *Id.* at 288. However, "contributory negligence of a form commonly passing under the name of assumption of the risk, consisting in voluntarily and unreasonably proceeding to encounter a known danger" is a defense to strict products liability. *Id.* at 286. Thus, the defense of comparative negligence requires an inquiry into whether each class member acted in such a way as to voluntarily and unreasonably encounter a known danger. More specifically, in order to pursue this defense, defendants will need to ask each class member whether they self-contaminated their property and, if so, what knowledge they had regarding MTBE at the time. It is conceivable that some of the class members were aware of the fact that spilling gasoline near their wells might cause contamination of their water supply. Thus, comparative negligence is an individual issue which will have to addressed separately for each class member.

Plaintiffs argue that any affirmative defenses that defendants might raise are issues which relate to damages, not liability, and therefore, this issue can be

---

[29] Many courts have found that the affirmative defenses of comparative negligence and contributory negligence raise individual issues which preclude certification. *See Georgine,* 83 F.3d at 628; *In re Dalkon Shield,* 693 F.2d at 853; *Insolia,* 186 F.R.D. at 541; *Emig,* 184 F.R.D. at 390-91; *Arch,* 175 F.R.D. at 491; *Smith,* 174 F.R.D. at 96-97; *Reed,* 1997 WL 538921, at *9; *Geiger,* 696 N.Y.S.2d at 352.

considered after the trial on defendants' liability. Pls' Reply Memo. at 23. However, as noted above, the defense of comparative negligence requires the trier of fact to *compare* the actions of the defendants with the actions of the plaintiffs in determining allocation of fault and damages. *See Austin*, 471 A.2d at 285; *see also Jackson v. Frederick's Motor Inn*, 418 A.2d 168, 173 (Me. 1980) ("The Act, entitled comparative negligence, demands from the jury that the respective fault of the parties be compared both in the liability phase of the process as well as in the apportionment-of-the-damages phase, but under different microscopic lenses."). Consequently, the issue of comparative negligence cannot be severed from the main liability trial but rather, must be considered contemporaneously with the issue of defendants' liability. *See Smith*, 174 F.R.D. at 96-97 (finding that certification was inappropriate, in part, because under Missouri law the issue of defendant's negligence could not be decided without reference to the class members' comparative fault which raised several individual issues).[30]

### iv.    Damages

For the Contaminated Subclass, plaintiffs have requested compensatory damages for the cost to clean-up their wells and groundwater sources which have

---

[30] Additionally, under the Unfair Trade Practices Act, 5 M.R.S.A. § 207 (1989), plaintiffs must show that the injury they suffered as the result of the defendants' unfair or deceptive trade practice could not have reasonably been avoided by them. *See supra* note 25, at 30. In defense to this action, defendants are entitled to argue that the contamination of some of the class members' wells could have been avoided by them, i.e., by not spilling gasoline on their property. This defense will have to be considered on an individual basis for each class member as it relates to the cause of the contamination in each well. *See supra* Part III.C.1.a.ii.

been determined to be contaminated with MTBE.[31] Plaintiffs have failed to show how such a damage request could be addressed on a class-wide basis. Defendants have offered the affidavit of Jeffrey Klaiber in support of their position that a determination of damages for the cost to clean-up plaintiffs' wells involves a multitude of individual issues which cannot be decided on a class-wide basis. Klaiber's affidavit and report reveal that not only are there a wide variety of remediation techniques which could be used alone or in combination to clean-up MTBE contamination, but determining which remediation method or methods are appropriate for a particular site will depend on a multitude of factors specific to each site. He states:

> There is no "one size fits all" remedial approach . . . Rather, it is an individual process for each site due to variation in, for example, the nature, extent, and mix of contaminants, the age of the contamination, the source and expected duration of contamination, the geology and hydrogeology, and the location and use of groundwater at the site. Even if concentrations of MTBE in groundwater are the same at different sites, remedial strategies at those sites can and typically will differ based on such site specific factors. Even where the use of the same or similar techniques is appropriate on different sites, the intensity, duration, and cost of the remediation can and generally will vary again based on site specific factors.

Defs' Affidavit of Klaiber at ¶ 6.

The multitude of factors that influence which remediation techniques are used can most easily be seen by reviewing the different remediation approaches

---

[31] Plaintiffs also request damages for lost property value resulting from the MTBE contamination of their groundwater sources. With regard to diminution in property value, the parties have presented conflicting affidavits on the issue of whether these damages can be determined on a class-wide basis. *See* Pls' Third Affidavit of Hinck Ex. 4; Defs' Affidavit of Lombardelli.

taken for eight properties in Maine which had MTBE groundwater contamination. *See* Defs' Affidavit of Klaiber Ex. B at 6-14.[32] A different approach was taken for each property, ranging from installing a filter and monitoring for contamination (Cathy and Richard Lemars' residence) to providing access to an alternative water source by constructing a waterline extension to the public water supply (Michael Millett's residence). *Id.* at 10-11, Figure 4. The remediation approach taken was in direct response to factors specific to each property. For instance, on the Lemars' property, source reduction was not considered possible because the source of the contamination could not be found or no longer existed. *Id.* at 10. In terms of cleaning up the MTBE, because the level of contamination in the Lemars' well was only slightly above the MDEP's action level of 25 ppb, only filtration and monitoring of the well were required. *Id.* Conversely, the contamination found on Millett's property required a much more aggressive approach. After the Millett property was found to be contaminated, twenty-two other private wells in the area were also found to be contaminated with MTBE in levels ranging from 3 ppb to 6,500 ppb. *Id.* at 10-11. The source of the contamination on Millett's property was determined to be an automobile accident near his home. *Id.* As part of the clean-up efforts, 118 tons of contaminated soil were excavated. *Id.* In Millett's case, rather than cleaning up the MTBE in his water supply, the decision was made to provide him, as well as others in his neighborhood, with access to the public water supply. *Id.* at 11. Factors which led to this decision included the site's geology and hydrogeology (fractured

---

32 Hereinafter Klaiber Ex. ___ at ___).

bedrock, coarse sand and boulders) which was conducive to the rapid spread of the contamination, proximity of the neighborhood to public water, and the availability of funding by the Maine Legislature. *Id*.

Klaiber's affidavit and his report provide persuasive evidence that a class-wide determination of damages for the cost to clean-up the contamination in plaintiffs' wells is not possible. There are too many individual factors which must be considered in determining how remediation is conducted on a particular site. The court is well aware that "[t]he need for individualized proof of damages, without more, is usually insufficient to preclude class certification." *Blake*, 1988 WL 6151, at *4; *see also Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977) ("[I]t has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate."). However, courts have considered the need for individualized proof of damages in their analysis of certification under subdivision (b)(3) and have relied, in part, on the fact that such individualized proof was necessary in denying certification.[33] Consequently, this court considers the fact that individualized proof will be required in order to determine the cost to clean-up plaintiffs' wells as only one of the many reasons which weigh against certification. Standing alone, this issue might not preclude certification, but when considered in

---

[33] *See Windham v. American Brands, Inc.*, 565 F.2d 59, 71 (4th Cir. 1977) ("[A] trial judge cannot, in determining the manageability of a proposed class action, look exclusively to only one aspect of the case . . . ; he can and must look at the case as a whole and . . . consider proof of damages as well as other issues in the case."); *Thomas*, 846 F.Supp. at 1404; *Evans v. City of Johnstown*, 470 N.Y.S.2d 451, 452 (N.Y. App. Div. 1983).

conjunction with all the other factors weighing against certification, it lends more support to this court's conclusion that certification is not appropriate.

### v.     Strict Products Liability - Seller requirement

Maine's strict products liability statute "imposes liability only on the person who sells the product in question." *Austin*, 471 A.2d at 284 (citing *Stanley v. Schiavi Mobile Homes, Inc.*, 462 A.2d 1144, 1147-48 (Me. 1983)); 14 M.R.S.A. § 221 (1980) ("One who sells any goods or products in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability . . . ."). Consequently, defendants argue that, at trial, plaintiffs will have to prove that the MTBE in each class member's well was sold by them as they are not the only manufacturer of MTBE.  Defs' Opposition at 11; Defs' Affidavit of Giacobbe (listing some of the manufacturers that produced MTBE in 1998).  If defendants are correct, then this would be an individual issue not capable of class-wide determination.

Plaintiffs respond that this argument mischaracterizes their claims which "are not limited to contamination caused solely by MTBE manufactured in Defendants' plants or sold or distributed by them."  Pls' Reply Memo. at 6.  They go on to explain that "their claims are not premised primarily on [a] manufacturer-consumer relationship.  Rather, their claims are based on Defendants' conduct in developing and promoting MTBE and MTBE RFG, and knowly [sic] misrepresenting its danger while creating the market for MTBE as the dominant oxygenate additive in gasoline." *Id*. It appears that plaintiffs are proceeding on a theory that the concept of "seller" in the products liability statute is broader than the plain meaning of that

38

term would suggest. Without considering the merits of plaintiffs' theory on who qualifies as a seller under the statute, the court notes that if their theory fails, significant problems regarding predominance will arise as they will have to show for each plaintiff that the MTBE in their well is defendants' MTBE. *See Arch*, 175 F.R.D. at 489; *Harding*, 165 F.R.D. at 630.

### vi.   Conclusion on the Predominance Factor

After consideration of just some of the individual issues raised by this litigation, this court finds that the predominance requirement has not been satisfied. Individual issues of reliance, causation, comparative negligence, and damages overwhelm this case to such a degree that certification under subdivision (b)(3) would be inappropriate. It is true that there are common issues in this case such as whether the defendants knew that MTBE poses a danger to groundwater and if so, whether they misrepresented or failed to warn of that danger. However, in order for this action to be certified as a class action under subsection (b)(3), those common issues must predominate. "Common issues are predominant only if their resolution would provide a definite signal of the beginning of the end." *M/V Emily S*, 158 F.R.D. at 15 (quoting *Mattoon*, 128 F.R.D. at 20). In this case, the resolution of these common issues would do little "to advance the cause of the class members as a group." *See In re Tetracycline Cases*, 107 F.R.D. 719, 733 (W.D. Mo. 1985) (quoting *Mertens*, 99 F.R.D. at 41). This is because, even after resolving the common issues, each class member would still have to individually prove that they relied on the defendants' misrepresentations and failure to warn, and that their reliance caused

their wells to become contaminated in order to prevail on their claims for negligent misrepresentation, fraud, and violation of *Restatement (Second) of Torts*, § 402B (1965). Class members would have to further prove that the defendants' actions caused each of their wells to be contaminated with MTBE in order to prevail on their strict liability, negligence, and unfair trade practices claims. Considering defendants' affirmative defense of comparative negligence, an assessment of whether each class member was contributorily negligent in causing the contamination of their well will have to be made. Finally, each class member would have to prove damages. It is these individual issues which will "take the most judicial time to resolve and which are central to the plaintiffs' ability to recover." *M/V Emily S,* 158 F.R.D. at 15. Therefore, this court finds that the predominance requirement in Rule 23(b)(3) has not been met and thus, the Contaminated Subclass cannot be certified.[34] Even though this court finds that the predominance requirement of subdivision (b)(3) has not been met, the court will still comment on that section's superiority requirement.

### b.  Superiority/Manageability

In addition to predominance, Rule 23(b)(3) requires the court to find "that a class action is superior to other available methods for the fair and efficient

---

[34] Having found that plaintiffs' claims of fraud, negligent misrepresentation, negligence, violation of the Unfair Trade Practices Act, violation of *Restatement (Second) of Torts* § 402B (1965), and strict products liability are not suitable for class certification, this court must also decline to certify this action on plaintiffs' claim of civil conspiracy. Under Maine law, a defendant cannot be held liable for civil conspiracy absent the commission of some other independently recognized tort. *See Potter, Prescott, Jamieson, & Nelson, P.A. v. Campbell,* 1998 ME 70, ¶ 8, 708 A.2d 283, 286. Therefore, plaintiffs' claim for civil conspiracy is not appropriate for class certification because this court has found that none of their other claims for tort liability are appropriate for certification.

40

adjudication of the controversy." M.R. Civ. P. 23(b)(3). Thus, the rule directs courts "to balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." *Georgine*, 83 F.3d at 632. "Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation." *Valentino*, 97 F.3d at 1234. "A class action is the superior method for managing litigation if no realistic alternative exists." *Id*. at 1234-35. Issues of class action manageability encompass the "whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen*, 417 U.S. at 164. And while a court "should not decline to certify a class because it fears that insurmountable problems may later appear," if the court finds "that there are serious problems *now appearing*, it should not certify the class merely on the assurance of counsel that some solution will be found." *Windham*, 565 F.2d at 70.

The most persuasive reason why the proposed class action is not the superior method for adjudication of this controversy is the same reason why this action cannot meet the predominance requirement. There are too many individualized issues which cannot be addressed on a class-wide basis. As a result, mini-trials will have to be conducted for each class member in order to address issues of reliance, causation, comparative negligence, and damages. The State has estimated that between 1,400 and 4,300 of Maine's private wells do not meet the State's standard for drinking water due to MTBE contamination. Thus, at a minimum, this court could expect that 1,400 individual trials will have to be conducted at some point during

41

this litigation. Such extensive individualized litigation significantly detracts from any efficiency a class action may have to offer. *See In re Dalkon Shield*, 693 F.2d at 856 ("The few issues that might be tried on a class basis in this case, balanced against issues that must be tried individually, indicate that the time saved by a class action may be relatively insignificant.").[35] Many courts have recognized that "[t]he greater the number of individual issues, the less likely superiority can be established." *Castano*, 84 F.3d at 745 n.19.[36] Additionally, it has been specifically acknowledged that management of a fraud class action is generally a "difficult proposition" due to the numerous individualized issues that must be addressed. *Anderberg*, 176 F.R.D. at 685; *see also Squitieri v. Gould*, 133 F.R.D. 25, 28 (E.D. Pa. 1990) ("[A] class action suit which would require the court to hold separate trials on the reliance issue with respect to possibly thousands of individual claimants would pose considerable administrative difficulty."). This court finds that the extensive individualized

---

[35] *See also O'Connor*, 180 F.R.D. at 383 (finding that where class members will have to "individually try substantial issues to establish their right to recover damages . . . class-wide litigation of issues common to the class will not necessarily 'reduce litigation costs and promote greater efficiency,' a key component of finding class treatment superior.") (quoting *Valentino*, 97 F.3d at 1234); Fed. R. Civ. P. 23(b)(3) advisory committee note, 39 F.R.D. at 103 (noting that a mass accident is ordinarily not appropriate for a class action because issues such as damages, liability and defenses to liability will affect class members in different ways and will result in "an action conducted nominally as a class action . . . denegrat[ing] in practice into multiple lawsuits tried separately").

[36] *See also Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 419 (5th Cir. 1998) ("The predominance of individual-specific issues relating to the plaintiffs' claims . . . in turn detracts from the superiority of the class action device in resolving these claims."); *Barreras Ruiz v. American Tobacco Co.*, 180 F.R.D. 194, 198 (D.P.R. 1998); *Young v. Ray Brandt Dodge, Inc.*, 176 F.R.D. 230, 234 (E.D. La. 1997) ("When individual questions of fact predominate over common questions, the litigation becomes unmanageable and less efficient than litigation involving smaller classes, or even a series of individual suits. Therefore, class certification of cases in which individual questions predominate also fails the test of superior adjudication.").

issues which must be addressed in this action preclude a finding that the class action device is the superior method of resolving this controversy.

Under Rule 23(b)(3)'s superiority requirement, this court is required "to balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." *Georgine*, 83 F.3d at 632. The Maine Legislature has created a "Ground Water Oil Clean-up Fund," 38 M.R.S.A. § 569-A (Supp. 1999), which provides an administrative remedy for some individuals whose groundwater has been contaminated with petroleum products. Specifically,

> [a]ny person claiming to have suffered property damage or actual economic damages, including, but not limited to, loss of income and medical expenses directly or indirectly as a result of a discharge of oil to ground water prohibited by section 543, . . . may apply to the commissioner within 2 years after the occurrence or discovery of the injury or damage, whichever date is later, stating the amount of damage alleged to have been suffered as a result of that discharge.

*Id.* § 569-A(2). There are limitations on a claimant's recovery under the Fund and so this remedy may not be adequate for some of the plaintiffs in this class action. *See id.* §§ 569-A(2)(G) (limiting recovery under the Fund to $200,000); 569-A(2)(H) (limiting the types of damages that can be recovered). Consequently, the existence of this administrative remedy alone is not sufficient for this court to conclude that the superiority requirement has not been met. However, the court does note that this administrative remedy may be more than adequate for some class members. In all likelihood, it would allow them to get their water contamination cleaned-up faster than those involved in this lawsuit and without having to incur the costs associated with litigation. Therefore, the existence of this administrative remedy, while not

43

conclusive on the issue of superiority, lends support to this court's conclusion that a class action is not the superior method of resolving this controversy.

Finally, this court notes that some courts have recognized that "when a plaintiff's theory is novel and untested, class certification is not a superior method of adjudication." *Young*, 176 F.R.D. at 234; *see also Castano*, 84 F.3d at 746-50; *Emig*, 184 F.R.D. at 394; *Arch*, 175 F.R.D. at 494-96; *Geiger*, 696 N.Y.S.2d at 353. The most widely cited case for this proposition is *Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996). In *Castano*, the Fifth Circuit engaged in an extensive discussion regarding the impropriety of certifying a class action based on an "immature tort." *Id.* at 746-50. In that case, although plaintiffs' suit was based on such basic claims as fraud, negligent misrepresentation, negligence, and strict products liability, the court found that their theory of liability, that addiction to cigarettes was a compensable injury, was an "immature tort" not suitable for class certification.[37] *Id.* at 737, 749. The Court first noted:

> In the context of mass tort class actions, certification dramatically affects the stakes for defendants. Class certification magnifies and strengthens the number of unmeritorious claims. Aggregation of claims also makes it more likely that a defendant will be found liable and results in significantly higher damage awards. In addition to skewing trial outcomes, class certification creates insurmountable pressure on defendants to settle, whereas individual trials would not. The risk of facing an all-or-nothing verdict presents too high a risk, even when the probability of an adverse judgment is low.

---

[37] The concept of an "immature tort" can refer to a new cause of action or an old cause of action applied to a new situation. *Arch*, 175 F.R.D. at 494.

44

*Id*. at 746 (citations omitted). After noting that "historically, certification of mass tort litigation classes has been disfavored," the Court found that "[t]he traditional concern over the rights of defendants in mass tort class actions" was magnified in the case before it. *Id*. at 746-747. Specifically, the court was concerned "that a mass tort cannot be properly certified without a prior track record of trials from which the district court can draw the information necessary to make the predominance and superiority analysis required by rule 23." *Id*. at 747. "This is because certification of an immature tort results in a higher than normal risk that the class action may not be superior to individual adjudication." *Id*. The Court further found that in the context of an immature tort, a finding that certification will conserve judicial resources is speculative. *Id*. at 749.

The comments and concerns raised by the Fifth Circuit in *Castano* regarding immature torts are particularly applicable to this action. MTBE has been used in gasoline in low concentrations (2-3%) for over twenty years. MTBE RFG, which contains 11% MTBE, was created to meet the requirements of the federal RFG program which was established by the 1990 Amendments to the Clean Air Act. While Maine was not required to participate in the RFG program, the State did choose to opt-in to the program. As a result, seven counties were required to sell MTBE RFG. In this context, plaintiffs now seek to hold defendants liable for the MTBE contamination of their groundwater supply regardless of the fact that someone else may have actually caused that contamination (i.e., spilled the gasoline) and the fact that the MTBE contaminating plaintiffs' water may not have

45

been manufactured or sold by the defendants. It would be an understatement to say that this is a unique case. To the court's knowledge, there has never been a case like this one brought to trial. And while there are a handful of other actions similar to this one pending around the country, it is the court's understanding that this action has progressed the furthest among them all.

This court is concerned by the prospect of binding a large class of Mainers to the decisions of one court and one jury when the novel issues and claims raised in this case have never been presented to a court in any individualized litigation in the State or elsewhere. *Emig*, 184 F.R.D. at 394. Rather than placing the viability of plaintiffs' claims and defendants' defenses in the hands of one jury and one court, this court finds that the better approach to this litigation is individual trials. "[T]he merits of this immature mass tort should first be adequately tested on an individual basis before the commencement of an enormous class action." *Geiger*, 696 N.Y.S.2d at 353. At some point in the future, a track record of individual trials may be created so that, upon examination, it is revealed that a class action would be the superior method of resolving claims such as those raised by plaintiffs, however, any such finding at this point in time would be nothing more than mere speculation. The court is not convinced at this stage of the litigation that a class action is the superior method for resolving this controversy.

2.      M.R. Civ. P. 23(b)(2) - Injunctive or Declaratory Relief Sought

Plaintiffs seek certification of their Untested Subclass pursuant to M.R. Civ. P. 23(b)(2). Rule 23(b)(2) provides that a class action is appropriate where "the party

46

opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." M.R. Civ. P. 23(b)(2). By its very terms, subdivision (b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." Fed. R. Civ. P. 23(b)(2) advisory committee note, 39 F.R.D. at 102; *see also Allison*, 151 F.3d at 411; *Probe v. State Teachers' Retirement Sys.*, 780 F.2d 776, 780 (9th Cir. 1986). "'[C]lass actions certified under Rule 23(b)(2) are not limited to actions requesting only injunctive or declaratory relief, but may include cases that also seek monetary damages,' but the class members' claims for money damages must be 'merely incidental' to their primary claim for injunctive relief." *Smith*, 174 F.R.D. at 100 (quoting *Probe*, 780 F.2d at 780).

Defendants have argued that certification under subdivision (b)(2) is inappropriate because plaintiffs seek primarily monetary relief. Plaintiffs respond that the relief they seek is analogous to a claim for medical monitoring which courts have found qualifies as injunctive relief. Several courts have considered the issue of whether medical monitoring is injunctive or monetary relief. In *Day v. NLO, Inc.*, 144 F.R.D. 330 (S.D. Ohio 1992), *vacated in part on other grounds sub. nom. In re NLO, Inc.*, 5 F.3d 154 (6th Cir. 1993), the district court observed:

> Relief in the form of medical monitoring may be by a number of means. First, a court may simply order a defendant to pay a plaintiff a certain sum of money. The plaintiff may or may not choose to use that money to have his medical condition monitored. Second, a court may order the defendants to pay the plaintiffs' medical expenses directly so that a plaintiff may be monitored by the physician of his choice.

47

Neither of these forms of relief constitute injunctive relief as required by rule 23(b)(2).

However, a court may also establish an elaborate medical monitoring program of its own, managed by court-appointed court-supervised trustees, pursuant to which a plaintiff is monitored by particular physicians and the medical data produced utilized for group studies. In this situation, a defendant, of course, would finance the program as well as being required by the court to address issues as they develop during program administration. Under these circumstances, the relief constitutes injunctive relief as required by rule 23(b)(2).

*Id.* at 335-36.[38]

In their third amended complaint, plaintiffs seek "[a]n order to compel Defendants to *pay* for Court-approved sampling and analysis for detectable quantities of MTBE of all private groundwater supplies on the real property" of the members of the Untested Subclass and to have this procedure repeated annually if it is shown through discovery or at trial that MTBE RFG is still or again sold in Maine. Ad Damnum Clause ¶ 2 (emphasis added). This request specifically asks this court to order the defendants "to pay" for Court approved testing of the water supplies of the Untested Subclass. Plaintiffs' complaint and memorandum of law in support of their motion for class certification all ask for the same thing - money to cover the costs of testing. *See id.*; Pls' Memo. at 3 ("[Plaintiffs] seek relief including an order

---

[38] *See also O'Connor*, 184 F.R.D. at 337 (noting that plaintiffs' first motion for certification under subdivision (b)(2) was denied because the relief sought by plaintiffs, the creation of "a reserve *fund* to pay for the cost of a medical monitoring program, as well as compensatory and punitive damages," was primarily monetary); *Smith*, 174 F.R.D. at 100 (finding that plaintiff's request for a medical monitoring fund was not injunctive relief but rather was "in the form of money which, along with Plaintiff's many other claims for monetary relief, demonstrates that monetary relief is the predominate relief sought"); *Gibbs v. E. I. DuPont De Nemours & Co.*, 876 F.Supp. 475, 481 (W.D. N.Y. 1995) ("A court-administered fund which goes beyond payment of the costs of monitoring an individual plaintiff's health to establish pooled resources for the early detection and advances in treatment of the disease is injunctive in nature rather than 'predominantly money damages' and therefore is properly certified under Rule 23(b)(2).").

compelling the Defendants to pay for regular court-approved testing of untested wells for MTBE contamination . . . ."); Pls' Memo. at 26 ("In this case, the relief sought by the Untested Well Subclass is limited to the cost of sampling and analysis of their untested groundwater."). *See also* Pls' Motion for Class Certification at 2 (stating that the "well testing subclass seeks only the injunctive relief of well testing"). No where in these pleadings do plaintiffs seek the creation of an elaborate monitoring program managed by court-appointed court-supervised trustees, pursuant to which the water source for each Untested Subclass member is monitored by particular scientists and the data gathered is utilized for group studies. *See Day*, 144 F.R.D. at 336. The court finds that plaintiffs' well testing claim is essentially a claim for monetary relief. *See Thomas*, 846 F.Supp. at 1404 (finding that "[w]hile plaintiffs seek to couch [their request for future medical monitoring] in the guise of injunctive relief for purposes of this motion [for class certification], their complaint requests 'the future costs of medical monitoring'" and this claim, which seeks "nothing more than compensation for necessary medical expenses reasonably anticipated to be incurred in the future," is not a claim for injunctive relief).

Plaintiffs also seek an "order requiring Defendants to issue warnings to Maine consumers, and where necessary *fund* corrective public education" regarding the threat MTBE poses to groundwater and the need for extra care when handling and using MTBE RFG. *Id.* ¶ 4 (emphasis added). While the request to order the defendants to issue warnings is certainly injunctive in nature, the second part of this request asks this court to order the defendants to "fund corrective public

49

education." This is a request for monetary relief. Plaintiffs are requesting money to pay for corrective public education on the dangers of MTBE.

When "'the realities of the litigation' demonstrate that the suit has been brought primarily for money damages, it may not be maintained as a (b)(2) class action." *Christiana Mortgage Corp. v. Delaware Mortgage Bankers Ass'n*, 136 F.R.D. 372, 381 (D.Del. 1991) (quoting *In re School Asbestos Litig.*, 789 F.2d 996, 1008 (3d Cir. 1986)). This court finds that the relief predominately sought by the Untested Subclass is monetary in nature and therefore, certification under Rule 23(b)(2) would be inappropriate.[39]

Even if the relief requested by plaintiffs could be characterized as injunctive in nature, this class is still not appropriate for certification under subdivision (b)(2). "While 23(b)(2) class actions have no predominance or superiority requirements, it is well established that the class claims must be cohesive." *Barnes*, 161 F.3d at 143. "The very nature of a (b)(2) class is that it is homogeneous without any conflicting interests between the members of the class." *Wetzel v. Liberty Mutual Ins., Co.*, 508 F.2d 239, 256 (3rd Cir. 1975). It is because of this cohesiveness that "an adequate class representative can, as a matter of due process, bind all absent class members by a judgment." *Walsh v. Great Atlantic & Pacific Tea Co.*, 726 F.2d 956, 963 (3rd Cir.

---

[39] The court also notes that plaintiffs' request for punitive damages is not limited to the Contaminated Subclass. Consequently, it appears from the Complaint that the Untested Subclass is also requesting punitive damages. If they are, then this is further evidence that certification under Rule 23(b)(2) would be inappropriate.

50

1983) (citing *Hansberry v. Lee*, 311 U.S. 32, 43 (1940)).[40] Ultimately, the interests of the class members must be so like those of the representatives that "injustice will not result from their being bound by such judgment in the subsequent application of principles of *res judicata*." *Hassine v. Jeffes*, 846 F.2d 169, 179 (3rd Cir. 1988).

The concerns expressed by this court in considering the adequacy of the Untested Subclasses' named representatives, *see supra* Part III.B.4, are also pertinent to the consideration of whether the proposed class is sufficiently cohesive to warrant certification under subdivision (b)(2). At first glance, the interests of the Untested Subclass appear to be cohesive - they all seek to have their wells tested for MTBE. However, upon closer examination, it is apparent that a significant conflict will arise among the members as a result of the way plaintiffs have designed this subclass. Specifically, a whole group of Untested Subclass members will learn that they have MTBE contamination on their property, yet, they will be barred from recovering in this action because the contamination level will not exceed the level required for them to be moved into the Contaminated Subclass. Not only will these class members be barred from recovering in this action, but these class members will also most likely be barred from bringing subsequent suits against the named defendants based on principles of res judicata. Because plaintiffs seek certification of the Untested Subclass under subdivision (b)(2), these class members will not be given

---

[40] *See also San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 445 (W.D. Tex. 1999) ("It is because of this homogeneity [that] courts are allowed to 'dispense with notice to the class and bind all members to any judgment on the merits without an opportunity to opt out.'") (quoting *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 451 (N.D. Cal. 1994)).

the opportunity to avoid this result because there is no right to opt out in a (b)(2) action. Because the interests of the Untested Subclass are not sufficiently cohesive, this court finds that certification under (b)(2) would be inappropriate.

## IV. Conclusion

There is no doubt that thé contamination of Maine's groundwater supplies by MTBE presents a major social problem that needs to be addressed. However, plaintiffs' proposed remedy, a statewide class action, is not available to address this growing problem because the requirements of Rule 23 have not been complied with. This court finds that the Contaminated Subclass representatives are inadequate because they have placed the class members at risk of being precluded from raising personal injury claims in a subsequent law suit against these defendants. The Untested Subclass representatives are also inadequate because they have designed this class in such a way that a whole segment of the Untested Subclass will learn that their wells are contaminated with MTBE but not at levels sufficient enough to move them into the Contaminated Subclass. As a result, these class members will not only be barred in this action from recovering compensatory damages to cover the cost of cleaning up their wells, but they will also be precluded from opting out of this litigation in order to protect their claims for personal injury damages.

This court also finds that the Contaminated Subclass cannot be certified as a class action under Rule 23(b)(3) because the individual issues of reliance, causation, damages, and comparative negligence predominate over the common issues that could be decided on a class-wide basis. Certifying this action as a class action would

require the court to hold hundreds of time-consuming individual trials on these issues, thereby detracting from any efficiency a class action may have to offer. Because of the multitude of individual issues which must be addressed, a class action is also not the superior method for resolving this controversy. Moreover, this suit involves novel issues and claims which have never been brought to trial in Maine or elsewhere. The merits of plaintiffs' claims and defendants' defenses should adequately be tested on an individual basis before attempting to bind a large class of Mainers to the decisions of one court and one jury.

Finally, this court finds that the Untested Subclass cannot be certified as a class action under Rule 23(b)(2) because the plaintiffs are seeking primarily monetary relief. Additionally, this proposed (b)(2) class lacks the cohesiveness necessary to allow the class representatives, as a matter of due process, to bind all of the absent class members. Although these class members all want their wells to be tested for MTBE, their interests will diverge once they obtain that relief because some members of the Untested Subclass will find out that their wells are contaminated with MTBE, but not at levels sufficient enough to move them into the Contaminated Subclass. As a result, these class members will not be able to recover damages in this action to cover the cost of cleaning up their wells and they will not be able to opt out of this litigation in order to protect any claims for personal injury that they may have. Because plaintiffs' proposed class action does not comply with all of the necessary requirements in Rule 23, their motion for class certification must be denied.

53

Wherefore the entry shall be

Plaintiffs' motion for class certification is DENIED.

Date: March __2__, 2000

Roland A. Cole
Justice, Superior Court

54

Date Filed __10/07/98__ __CUMBERLAND__ Docket No. __CV98-555__
County

Action ____PERSONAL INJURY____

MICHAEL A. & DEBORAH L. MILLETT                    ATLANTIC RICHFIELD COMPANY
CATHY LEMAR                                         ARCO CHEMICAL COMPANY
RICHARD LEMAR                                       LYONDELL CHEMICAL COMPANY
MONIQUE LEAMON   DONALD L. GARBRECHT                OXYGENATD FUELS ASSOCIATION
                  LAW LIBRARY     AMER. PETRO. INS. dba MAINE PETROLEUM ASSOCIATION
                                                    DOES 1 THUR 25, INCLUSIVE
                                                    PATRICIA AHO
                  MAR 6 2000     vs.               NANCY BALTER, PhD
                                                              VS

| Plaintiff's Attorney | Defendant's Attorney  WAYNE M. CONLAN |
|---|---|
| | WILLIAM J. KAYATTA, JR. ESQ   791-1238 |
| JON HINCK, ESQ.          874-7407 | JOHN J. AROMANDO, ESQ  (ARCO, Lyondell) |
| 75 MARKET STREET | ONE MONUMENT SQUARE, PM  04101 |
| SUITE 507 | |
| PORTLAND, MAINE  04101 | JONATHAN PIPER, Esq/RANDALL WEILL ESQ. |
| | PO BOX 9546 PM 04112 (Atl.Rich. Corp.) |
| Lewis Saul, Esq.   874-7407 | ALAN HOFFMAN EQ. (Lyondell/ARCO) |
| Lewis Saul & Assoc. | ONE LOGAN SQUARE, PHIL, PA |
| 183 Middle St, Ste. 200, P.M.  04101 | 550 JEFFREY THALER, ESQ. (Oxy. Fuels/Balter) |
| | PO 9729 PM 04104 774-1200 |

| Date of Entry | | JOSEPH GROFF II ESQ. (ME. Pet. Assoc) |
|---|---|---|
| | William Robitzek, Esq. | PO BOX 4510 PM 04112    (AHO) |
| | P.O. Box 961 | MARK LAVOIE/DAVID HERZER ESQ. (CONLAN) |
| 1998 | Lewiston, ME  04243 | PO BOX 4600, PM 04112 |
| Oct. 08 | Received 10/07/98: | PHILIP CURTIS ESQ./ROBERT MASON ESQ. |
| | Complaint Summary Sheet filed. | ANDREW RATKIN ESQ.    (Atlantic Richfield |
| | Complaint filed. | 399 Park Ave New York, New York |
| "" "" | | 10022-46 |
| Oct. 21 | Received 10-20-98: | |
| | Summones filed. | |
| | Maine Petroleum Association served to Patricia Aho, Director on 10-13-98. | |
| " " | Arco Chemical Company served to CT. William Richardson on 10-09-98. | |
| " " | Atlantic Richfield Company served to C.T. William Richardson on 10-09-98. | |
| " " | Lyondell Chemical Company served to C.T. William Richardson on 10-09-98. | |
| Oct. 29 | Received 10-29-98: | |
| | First Amended Class Action Complaint filed. | |
| Oct. 29 | Received 10-29-98: | |
| | Copy of Defendant ARCO Chemical and Lyondell Chemical Companys' | |
| | Notice of Removal filed. | |
| " " | Defendants ARCO Chemical and Lyondell Cheimcal Company's Notice of | |
| | Filing of Notice of Removal filed. | |
| Oct. 30 | Received 10-30-98: | |
| | Defendant Richfield's Notice of Filing of Joinder in Notice of Removal | |
| | filed. | |
| Nov. 02 | Received 11-02-98: | |
| | Defendant Oxygenated Fuels Association's notice of Filing of Joinder | |
| | in Notice of Removal filed. | |
| Nov. 04 | Received 11-03-98: | |
| | Defendants ARCO Chemical Company and Lyondell Chemical Company's | |
| | Notice of filing of Amended Notice of Removal filed. (Copy of) | |
| " " | Copy of Defendants ARCO Chemical Company and Lyondell Chemical Company's | |
| | Amended Notice of Removal filed. | |
| Nov. 05 | Received 11-04-98: | |
| | Defendant American Petroleum Institute's copy of Joinder in Notice of | |
| | Removal filed. | |
| " " | Copy of Defendant American Petroleum Institute's Notice of Filing of | |
| | Joinder in Notice of Removal filed. | |